Lieutenant Mary OGDEN, et al.,
Plaintiffs-Appellants,

v.

The UNITED STATES of America, et
al., Defendants-Appellees.

No. 83-3191.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 3, 1984.

Decided March 29, 1985.

David A. Novoselsky, Chicago, Ill., for plaintiffs-appellants.

Margaret C. Gordon, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.

CUMMINGS, Chief Judge.

Plaintiffs appeal from the district court's grant of defendants' motion for summary judgment. The plaintiffs, certain active and nonactive duty military personnel and civilians, seek damages under 42 U.S.C. §§ 1983 and 1985 and under a *Bivens* -type

remedy[1] and injunctive relief for alleged violations of the First Amendment arising out of a February 6, 1982, "off-limits" declaration ordered by the defendant, then Commander of the Great Lakes Naval Training Center, Rear Admiral James H. Flatley III. For the reasons set forth below, we affirm in part and reverse and remand in part.

## I

On February 6, 1982, Rear Admiral Flatley, the Commander of the Great Lakes Naval Training Center (GLNTC) issued an "off-limits" declaration which prohibited "all naval personnel attached to activities comprising the Great Lakes naval complex" from entering the three following areas or facilities operated by the Christian Fellowship Church or the Christian Fellowship, Inc. (CFI) (as it is referred to by defendants): 1) the Christian Servicemen's Center, 2136 Sheridan Road, North Chicago, Illinois, 2) the "main office" [of the Church presumably] at 401 Washington Street, Waukegan, Illinois, and 3) the Karcher Hotel, 405 Washington Street, Waukegan, Illinois (Plaintiffs' App. 44). The Servicemen's Center is located directly across from the GLNTC and the other off-limits areas are located in nearby Waukegan, Illinois. The off-limits order sets forth the following explanation for the action (Plaintiffs' App. 43):

> * * * Christian Fellowship, Inc., has been using its religious facade to induce immature/susceptible Armed Forces personnel to prematurely terminate their military careers under less than completely honorable conditions and subsequently use said individuals for both homosexual and financial gains. Such behavior poses a serious threat to the health, welfare, and morals of Armed Forces personnel. In addition, it is also

well documented that the Christian Servicemen's Center has long counselled Great Lakes naval personnel to absent themselves without authority from their commands.

Specific authorization for the order derives from 10 U.S.C. § 5947 which imposes upon officers in the Navy the duty "to take all necessary and proper measures, under the laws, regulations, and customs of the naval service, to promote and safeguard the morale, the physical well-being, and the general welfare of the officers and enlisted persons under their command or charge." The statute is implemented, in part, by 32 C.F.R. § 631.11(b) (1982), which empowers commanders to establish off-limits areas "to help maintain good discipline and an appropriate level of good health, morale, safety, morals, and welfare of Armed Forces personnel" and by United States Navy Regulations 0702 ¶ 4 and 0727a (Bureau of Naval Personnel Instruction 1620.-4B) which require the commanding officer, *inter alia*, to "exercise * * * judicious attention to the welfare of persons under their control or supervision" and "[u]se all proper means to foster high morale, and to develop and strengthen the moral and spiritual well-being of the personnel under his command * * * " (Defendants' Br. vii, ix, x and Appendix A–6, A–7).

The plaintiffs filed this action on April 29, 1982, seeking money damages and declaratory and permanent injunctive relief. They alleged that the defendants, in declaring CFI sites off-limits, acted unreasonably and in bad faith in violation of their First Amendment rights.[2]

The federal defendants moved to dismiss the complaint or in the alternative for summary judgment on August 31, 1982, and on September 17, 1982, submitted a memoran-

---

**1.** *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 395–397, 91 S.Ct. 1999, 2004–2005, 29 L.Ed.2d 619, held that an injured person should have a judicial remedy (there damages) for federal agents' constitutional violations.

**2.** The complaint also charged the City of Waukegan with conspiracy to deprive plaintiffs of their

constitutional rights, giving rise to liability under 42 U.S.C. § 1985. After receiving the district court's judgment granting its motion to dismiss (Plaintiffs' App. 75), defendant City of Waukegan settled with plaintiffs and is no longer a party to this suit.

dum of law in support of their motion. Government exhibits 1–11, which contain virtually all the information relied upon by Admiral Flatley in reaching his decision to issue the order, were proffered to the court along with the defendants' memorandum of law. Plaintiffs filed a motion for a temporary restraining order on September 24, 1982, which alleged that violations of the right to free exercise of religious beliefs (stemming in part from Admiral Flatley's February 6 order) had occurred aboard the Navy vessels U.S.S. Texas and U.S.S. America in July and August of 1982. The motion requested that defendants be prohibited from discouraging participation by military personnel in the CFI's religious activities conducted on any vessels or land-based facilities. Judge Leighton denied that motion and ordered plaintiffs to respond to the defendants' dismissal or summary judgment motion by October 29, 1982. After receiving three extensions of time plaintiffs filed their response on August 31, 1983. They also filed and served a discovery request on defendants on December 29, 1982. Defendants responded to the discovery request on March 11, 1983, and objected to each of plaintiffs' thirty-six discovery requests, claiming that the requested documents either already had been produced, involved privileged communications or did not exist (R. Item 34).

On July 29, 1983, in light of the United States Supreme Court's decision in *Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586, plaintiffs requested voluntary dismissal of their claims pursuant to Fed.R.Civ.P. 41(a)(2), so that they could proceed in the military court system. The motion for voluntary dismissal without prejudice was denied by the district court on the same day. Although plaintiffs originally appealed from this denial, they conceded at oral argument that no purpose would be served by allowing them to proceed first in military court. Moreover, plaintiffs' precise claims before us were twice presented to the military court and rejected. See *infra* p. 1177.

Judge Leighton issued an order and memorandum opinion on November 7, 1983,

granting all defendants' motions to dismiss and motions for summary judgment (Plaintiffs' App. 72–75). The February 6, 1982, off-limits order has remained in effect throughout this litigation and the Servicemen's Center has been left vacant.

In response to plaintiffs' allegations below, Admiral Flatley stated that in reaching his decision he principally relied on four evidentiary matters: 1) reports of a comprehensive Naval Investigative Service (NIS) investigation conducted in the first half of 1980, containing evidence in the form of sworn written statements and records of interviews of former members of the U.S. Navy and others who had been associated with the CFI between approximately 1974 and 1980 (Exhibit B of R. Item 22), 2) a November 1980 NIS report of an investigation by the Waukegan Police Department into a complaint of deviate sexual assault filed by a then seaman recruit (Exhibit C of R. Item 22), 3) a set of three videotape cassettes recorded in late 1981 and a transcription thereof, containing interviews of two ex-navymen and CFI members and other information resulting from the videotape regarding the son of a chief petty officer (Exhibit D of R. Item 22), and 4) various news articles printed by the *Waukegan News-Sun* concerning the CFI and its leader, Reverend L.R. Davis (Exhibit B of R. Item 22), contained in the 1980 NIS investigation report, and information from a discussion with the *Waukegan News-Sun* concerning a forthcoming article regarding the experiences with the CFI of the two navymen interviewed in the videotapes (¶¶ 7–10, Government Exhibit 2 (Flatley Affidavit) of R. Item 22).

The original 1980 NIS investigation consisted of the sworn testimony of four seamen and former CFI members and a synopsis of a former seaman and CFI member's statements (Exhibit 2B of R. Item 22). One of these interviews, taken March 28, 1980, is particularly notable. It consists of an extensive and detailed account of a former serviceman's and his family's involvement with the CFI and L.R. Davis. The testimony recounts various attempts by

Davis to encourage and even order the serviceman and other sailors and CFI members to have unauthorized absences from the Navy (or to "go UA" in ordinary Navy terminology) which would ultimately result in their discharge. It named seven sailors encouraged to go UA by Davis and stated that five had in fact gone UA. The testifying sailor ultimately was discharged from the Navy but later reenlisted. He also recounted numerous attempts by L.R. Davis to induce him to engage in sexual activity with Davis. In a much shorter statement taken on February 27, 1980, the sailor's brother, also a seaman and former CFI member, revealed that L.R. Davis had succeeded in encouraging him to go UA on several occasions and that the UAs ultimately led to his discharge from the Navy (Exhibit 2B of R. Item 22).

A third transcript of testimony, taken March 10, 1980, stated that L.R. Davis had convinced two other servicemen to go UA. A fourth serviceman, then in the Navy, testified on March 25, 1980, that Davis encouraged him to leave the Navy. He also stated that Davis once propositioned a male third person to engage in a homosexual act with him for $500. The testimony synopsis of a then member of the Navy stated that Davis harbored UA sailors, but that Davis counselled the sailors to return to the Navy. The NIS confirmed that three former navymen and CFI members listed in the most detailed account had documented UAs in their records and that two of these navymen received general discharges.

The 1980 NIS report also contained interviews with two civilians. The first civilian, who had enrolled in Davis' probation program, testified that he allowed Davis to engage in homosexual activities with him because of fear of the church leader and because of Davis' willingness to pay him for the acts. A member of the Waukegan Police Department, Detective Frank Bullock, stated that sexual allegations had been leveled by the civilian and several other probationers and that while he believed the allegations to be true, there was insuffi-

cient evidence to prosecute (Exhibit B of R. Item 22).

The second civilian, an important figure in the CFI before leaving the group, testified on March 3, 1980, that he had witnessed Davis intimidate sailors into going UA and further stated that "a few of the sailors deeply involved with Davis complained * * * of homosexual activities between Davis and themselves" (Exhibit B of R. Item 22). He further estimated that Davis had suggested "the UA process" to approximately ten percent of the 400 to 500 sailors baptized by the CFI (*id.*).

Finally, the 1980 NIS report contained newspaper clippings of the *Waukegan News-Sun* which recounted statements of certain former navymen and CFI members regarding Davis' encouragement of UAs and his sexual advances. In November of 1980 the NIS report was supplemented with details of the alleged sexual assault of a former seaman perpetrated by L.R. Davis.

The videotapes of interviews with two former seamen related Davis' sexual advances and his encouragement of UAs. The testimony of these men as well as of the other navymen and a civilian interviewed by the NIS contained consistent details of the manner in which the CFI recruited its members and of Davis' substantial control over church activities and over the lives of its members.

After the alleged sexual assault incident in November of 1980, the then Commander of the GLNTC, Admiral Gurney, asked James A. Freyer, Commander, Judge Advocate General's Corps, U.S. Navy (attached to the Staff of Commander, GLNTC), to render a legal opinion regarding the CFI/Davis investigation. Freyer recommended to Admiral Gurney that Davis and the CFI not be put off-limits because "much of what was in the [NIS] reports was somewhat old at that point" and because Freyer felt that the basis for any off-limits order "would be much stronger if there were some action in the criminal area taken by civil authorities first" (p. 8 of R. Item 45). No civilian criminal action subse-

quently was taken and in Freyer's words, "then time passed and it ceased to be a pressing issue" (*id.* at 9). Admiral Gurney was relieved in May of 1981 and Captain Steckman, then Chief of Staff of the Naval Training Center, assumed command until October 15, 1981, when Admiral Flatley became the Center Commander.

In December of 1981 the videotape interviews were brought to the attention of officials at the GLNTC by civilians and were ultimately reviewed by Admiral Flatley. Flatley stated that he decided some action regarding the CFI was necessary in mid-to-late January of 1982. On Thursday, February 4, 1982, Admiral Flatley, along with the Lake County, Illinois, State's Attorney and members of the Waukegan Police Department, was invited to attend a meeting held by the *Waukegan News-Sun* where the newspaper revealed that, despite the existence of a pending libel suit brought against the paper by the CFI, it was going to release an "exposé" article on Saturday, February 6, dealing with statements of the navymen interviewed on videotape. Admiral Flatley had planned to request an off-limits order at the scheduled February 11, 1982, meeting of the Armed Services Disciplinary Review Board (p. 52 of R. Item 45). A "recruit graduation," however, was to take place the weekend of February 6 to 7, which would involve some 1,100 recruits (with one-third of them only seventeen years of age) and two to three thousand parents coming into town. Admiral Flatley's concern with the bad impression to be created by the newspaper exposé and with the effects of such bad publicity motivated him to issue the challenged order immediately (p. 53 of R. Item 45).

The declaration was reviewed at the February 11 meeting of the Armed Services Disciplinary Review Board and a resolution was adopted unanimously confirming the off-limits action (p. 16 of R. Item 45). The United States Military Court reviewed the decision on May 25, 1982, and ruled that the February 6 declaration was legal and constitutional (p. 73 of R. Item 45).

The only document submitted to the court below which refuted in any way the substantial evidence of wrongdoing by L.R. Davis is a transcript of the direct examination and cross-examination of Admiral Flatley and Commander Freyer taken before the U.S. Military Court. The questioning of those officers attempted to point out certain inadequacies of the Navy's evidence against Davis. These alleged defects include: 1) Admiral Flatley admitted that the local State's Attorney refused to pursue the sexual assault incident because the involved navyman's account was discredited due to "a similar involvement elsewhere" and that as of the time of the February 6 order the Admiral knew that the navyman in question had admitted to being a convicted thief (p. 55 of Exhibit A to R. Item 45), 2) Admiral Flatley admitted that there was virtually no investigation into the credibility of the persons making statements relied upon in his decision and that he was "disappointed that [he] didn't generate a lot more investigative process before he made this decision" (*id.* at 56, 58), 3) both of the servicemen involved in the videotape interviews voluntarily took polygraph examinations in January of 1982 (apparently regarding testimony given in the videotapes) and the examiner determined that both were lying with regard to unspecified questions (*id.* at 61), 4) the videotaped statements could have been "gleaned" from earlier newspaper reports regarding the CFI (*id.* at 70–71), 5) the civilian probationer interviewed by the NIS previously had stated that he never had been treated immorally nor mistreated by the CFI (*id.* at 57), 6) the videotaped interviews were prepared by the Citizens' Freedom Foundation, an "anticult type organization" and the interviews were conducted by a "deprogrammer" of the group, David Clark (*id.* at 10).

The district court dismissed defendants the United States of America, the Departments of Defense and the Navy, and the Naval Personnel Command because they were not amenable to suit since no statute waived sovereign immunity in this case. The military hierarchy above Admiral Flatley were granted summary judgment be-

cause their uncontradicted affidavits established that they had no direct involvement in the issuance of the off-limits order. Finally, all the federal defendants including Admiral Flatley were entitled to judgment as a matter of law in the district court's view because *Chappell v. Wallace, supra,* barred any suit against military officers for personal liability brought by those under their command. The district court did not review whether Admiral Flatley had authority to issue the declaration nor whether the declaration was issued in an arbitrary fashion.

## II

■ The district court was correct in ruling that *Chappell v. Wallace, supra,* precludes any monetary relief for plaintiffs. The Supreme Court there considered the availability of a *Bivens*-type remedy for damages against federal officials whose actions violate an individual's constitutional rights in the context of enlisted military personnel suits against superior officers. See *supra* note 1. The plaintiffs in *Chappell,* five enlisted seamen, brought suit seeking monetary and other relief against their commanding officers because of alleged racial discrimination. The Supreme Court reiterated its prior cautioning that a *Bivens*-type remedy "will not be available when 'special factors counselling hesitation' are present." 462 U.S. at 298, 103 S.Ct. at 2364 (quoting *Bivens,* 403 U.S. at 396, 91 S.Ct. at 2005). The Court concluded that "the unique disciplinary structure of the military establishment and Congress' activity in the field constitute 'special factors' which dictate that it would be inappropriate to provide enlisted military personnel a *Bivens*-type remedy against their superior officers." *Id.,* at 304, 103 S.Ct. at 2367. To the extent plaintiffs rely on such a remedy (complaint prayer for relief (c) at pp. 22, 28, 34 and 40), *Chappell* squarely precludes their claims.

Plaintiffs, however, charge that the district court read *Chappell* too broadly and that the situation involves such substantially different concerns from those present in *Chappell* that its reasoning is inapplicable to these facts. They point out that the plaintiffs in *Chappell* complained of their treatment while on duty in a "purely military setting," whereas here plaintiffs challenge regulation of off-site and off-duty activity involving nonactive duty personnel. The authority of commanders to issue off-limits orders, however, is a traditional part of the "hierarchical structure of discipline and obedience" that the *Chappell* Court sought to protect. Cf. *Harper v. Jones,* 195 F.2d 705 (10th Cir.1952); *Ainsworth v. Barn Ballroom Co.,* 157 F.2d 97 (4th Cir. 1946); *United States v. Cantrell,* 307 F.Supp. 259 (E.D.La.1969). A *Bivens*-type remedy damage suit challenging a commander's off-limits declaration would be no less disruptive of the relation between enlisted personnel and their superiors than a damage suit of the type condemned in *Chappell* arising from a superior's decisions regarding assignment of duties, imposition of penalties and evaluation of performance. Plaintiffs' distinctions are without merit.

Nor do we view plaintiffs' circumstances as falling within the Supreme Court's statement in *Chappell* that it has never held nor was it then holding "that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service." 462 U.S. at 304, 103 S.Ct. at 2367. The precise meaning of this statement is discussed below. See *infra* p. 1175.

Plaintiffs also attempt to distinguish their case from *Chappell* on the ground that they additionally have brought a § 1983 action whereas *Chappell* involved a non-statutory *Bivens*-type action for violations of the Constitution. This contention is baseless. The district court correctly ruled that plaintiffs' action does not present a cognizable § 1983 claim since that statute only provides a remedy for deprivations of rights, privileges and immunities which are perpetrated under color of state law. See, *e.g., Smith v. United States Civil Service Commission,* 520 F.2d

731, 733 (7th Cir.1975). It has never been alleged that federal defendants were acting "under color of any statute, ordinance, regulation, custom or usage of any State." 42 U.S.C. § 1983. As noted, the claims against the City of Waukegan are no longer part of this action. Plaintiffs erroneously cite *Butz v. Economou,* 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895, as allowing a § 1983 suit against federal officials acting under federal law. *Butz* merely ruled that the law of "official immunity" developed in cases dealing with § 1983 actions also should be applied to *Bivens*-type actions.

■ *Chappell* left open one possible exception where a damage suit in this context might still be appropriate. The Court expressly refused to decide whether a suit seeking damages flowing from an alleged conspiracy actionable under 42 U.S.C. § 1985(3) was maintainable in the case before it. *Chappell,* 462 U.S. at 305 n. 3, 103 S.Ct. at 2368 n. 3. While plaintiffs have cited § 1985 in their complaint, they neither briefed nor argued before this Court the question left open in footnote three of *Chappell,* nor did they respond below to defendants' arguments that a § 1985(3) action, involving a suit by enlisted military personnel against their superiors, is not maintainable for several reasons.[3] In these circumstances, any claim based on § 1985 is waived,[4] so that we need not decide whether the district judge correctly concluded that "the doctrine of intramilitary immunity recognized in *Chappell* should pertain with equal force to claims [of religious-based discrimination] brought

pursuant to [§ 1985]" (Defendants' App. A–4).

## III

■ The district court did not expressly deny plaintiffs' claims for injunctive relief nor specifically consider whether the *Chappell* decision was also a bar to such relief. We hold that *Chappell* does not preclude an equitable remedy and that the district court erred in not addressing the injunctive requests. *Chappell* contains the express qualification that military personnel are not barred from "all redress in civilian courts for constitutional wrongs suffered in the course of military service." *Chappell,* 462 U.S. at 304, 103 S.Ct. at 2367. The Court cited three of its decisions as supporting this proposition. These cases involved facial attacks on the constitutionality of statutes and regulations concerning the military in which the Court expressly considered: 1) whether Air Force Regulation 30–1(9) (1971) (requiring a commander's prior approval of any person soliciting signatures on a petition on an Air Force facility) was an unconstitutional prior restraint on speech, *Brown v. Glines,* 444 U.S. 348, 353, 100 S.Ct. 594, 598, 62 L.Ed.2d 540, 2) whether Articles 133 and 134 of the Uniform Code of Military Justice (punishing "conduct unbecoming an officer and a gentleman" and "all disorders and neglects to the prejudice of good order and discipline in the armed forces") were void for vagueness under the due process clause of the Fifth Amendment and overbroad in violation of the First Amendment, *Parker v. Levy,* 417 U.S. 733, 752, 94 S.Ct. 2547, 2559, 41 L.Ed.2d 439, and 3) whether 37 U.S.C.

---

3. Defendants' principal contention was that relief under § 1985 is precluded in situations where federal officers act under color of federal law. See *Bethea v. Reid,* 445 F.2d 1163 (3d Cir.1971), certiorari denied, 404 U.S. 1061, 92 S.Ct. 747, 30 L.Ed.2d 749; *Ryan v. Cleland,* 531 F.Supp. 724 (E.D.N.Y.1982); *Stockheimer v. Underwood,* 428 F.Supp. 192 (W.D.Wis.1977); *Moore v. Schlesinger,* 384 F.Supp. 163 (D.Colo. 1974); *Williams v. Halperin,* 360 F.Supp. 554 (S.D.N.Y.1973). Defendants' position, however, is difficult to reconcile with the holding of *Griffin v. Breckenridge,* 403 U.S. 88, 96–102, 91 S.Ct. 1790, 1795–1798, 29 L.Ed.2d 338 (state action is

not a prerequisite to § 1985(3) claims) and appears to represent the minority rule. See *Hobson v. Wilson,* 737 F.2d 1 (D.C.Cir.1984); *Dry Creek Lodge, Inc. v. United States,* 515 F.2d 926 (10th Cir.1975); *Waller v. Butkovich,* 584 F.Supp. 909 (M.D.N.C.1984); *Peck v. United States,* 470 F.Supp. 1003 (S.D.N.Y.1979); *Alvarez v. Wilson,* 431 F.Supp. 136 (N.D.Ill.1977).

4. See *e.g., City of Chicago v. United States Dep't of Labor,* 753 F.2d 606, 607 n. 1 (7th Cir.1985), and cases cited therein.

§§ 401, 403 and 10 U.S.C. §§ 1072, 1076 (providing that spouses of male members of the uniformed services are dependents for purposes of medical and dental benefits, but that spouses of female members are not dependents unless they are in fact dependent for over one-half of their support) caused a difference in treatment constituting unconstitutional discrimination against servicewomen in violation of the due process clause, *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583. The Court upheld the challenged provisions in *Brown* and *Parker* but struck down the relevant statutes in *Frontiero.* The suits requested nonmonetary relief, as opposed to the monetary damages sought in *Chappell,* and were brought either by former military personnel (recently dismissed through application of the challenged provisions, see *Brown* and *Parker*) or by active-duty personnel (see *Frontiero*) against their immediate and top-level superiors, *i.e.,* the Secretaries of Defense, the Army and the Air Force, a Major General and a Commander.

Apart from permitting facial attacks on statutes and regulations, the Court in *Parker* and *Brown* also indicated the propriety of civilian judicial review of specific applications of the challenged provisions. In *Parker,* the Court stated that a wide range of conduct of military personnel could be validly proscribed by Articles 133 and 134 of the Code of Military Justice, but conceded that "there may lurk at the fringes of the articles, even in the light of their narrowing construction by the United States Court of Military Appeals, some possibility that conduct which would be ultimately held to be protected by the First Amendment could be included within their prohibition * * *." *Parker,* 417 U.S. at 760–761, 94 S.Ct. at 2564. The Court stated, however, that plaintiffs' conduct (publicly urging enlisted personnel to refuse to obey orders which might send them into combat in Vietnam) was unprotected under the most expansive notions of the First Amendment. *Id.* at 761, 94 S.Ct. at 2564. The implication that the Court could forbid the unconstitutional prohibition of protected conduct is clear.

More expressly, in upholding the challenged Air Force regulation in *Brown,* the Court remarked that "[c]ommanders sometimes may apply these regulations [regarding internal discipline] irrationally, invidiously, or arbitrarily,' thus giving rise to legitimate claims under the First Amendment." 444 U.S. at 357 n. 15, 100 S.Ct. at 601 n. 15 (citing *Greer v. Spock,* 424 U.S. 828, 840, 96 S.Ct. 1211, 1218, 47 L.Ed.2d 505 (commander generally may prohibit distribution of certain publications by civilians and plaintiffs failed to raise the issue of a specific unconstitutional application of challenged regulation)). The Court gave no indication that the type of nonmonetary relief sought in *Brown* and granted in *Frontiero* would be unavailable to enforce these legitimate First Amendment claims of military personnel. It noted, however, that Captain Glines had never requested permission of his superiors to engage in the specific prohibited conduct—the circulation of certain petitions—and thus was barred from challenging the specific application of the provision. *Id.*

Plaintiffs' challenge to the February 6 declaration is no different from those sanctioned in *Brown* and *Parker.* Plaintiffs dispute the propriety of Admiral Flatley's application of 10 U.S.C. § 5947 and its implementing regulation 32 C.F.R. § 631.-11(b), which authorizes a commander to establish off-limits areas "to help maintain good discipline and an appropriate level of good health, morale, safety, morals and welfare of Armed Forces personnel." At a minimum, *Parker* allows us to consider whether Admiral Flatley's declaration is an arbitrary, invidious or irrational application of 32 C.F.R. § 631.11(b) in violation of the First Amendment, and if it is so found, to bar its enforcement. The precise standard of review to be applied in this type of situation is set out in detail below. See *infra* pp. 1178–1181.

▮ Before proceeding with regard to plaintiffs' nonmonetary claim we must clarify precisely which issues and which de-

fendants are properly before us. The district court ruled that certain defendants were not amenable to suit in this action. Specifically with regard to injunctive relief, we disagree in part. It is clear that the United States and its agencies may not be named as parties and sued without specific statutory consent and that waiver of sovereign immunity will not be implied but must be unequivocally expressed. See, e.g., *Champaign-Urbana News, Inc. v. J.L. Cummins News Co.*, 632 F.2d 680, 687 (7th Cir.1980); *Shelton v. U.S. Customs Service*, 565 F.2d 1140 (9th Cir.1977). No such statute exists relevant to the present case; consequently, the United States and the Departments of Defense and the Navy were properly dismissed as defendants. The district court also dismissed all the defendant military officials above Admiral Flatley because "they had no direct involvement in the issuance of the off-limits order" (citing *Black v. United States*, 534 F.2d 524 (2d Cir.1976), and *Green v. Laird*, 357 F.Supp. 227 (N.D.Ill.1973)) (Defendants' App. A–3). The court apparently was applying the test utilized in § 1983 cases for determining the liability of high-level officials for the acts of subordinates. See *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611.

▪ We first note that where injunctive, as opposed to monetary relief is sought, no "direct and personal" involvement is required in order to hold high-level officials responsible for the actions of subordinates and to subject them to the equitable jurisdiction of the court. The Secretaries of Defense and of the Navy have been subjected to suit for nonmonetary relief without any particular showing of personal involvement where a statute or regulation has been challenged as facially unconstitutional, see *Frontiero, supra; Brown, supra; Beller v. Middendorf*, 632 F.2d 788 (9th Cir.1980), certiorari denied, 454 U.S. 855, 102 S.Ct. 304, 70 L.Ed.2d 150, or unconstitutional as applied, see *Goldman v. Secretary of Defense*, 734 F.2d 1531 (D.C.Cir.1984); *McQueary v. Laird*, 449 F.2d 608 (10th Cir.1971); *Bitterman v. Secretary of Defense*, 553 F.Supp. 719 (D.D.C.1982), or where "agency action" has been challenged as unconstitutional, see *Neal v. Secretary of Navy*, 472 F.Supp. 763 (E.D.Pa.1979). There is no question here that the Commander of the GLNTC is subject to plaintiffs' suit for equitable relief and that point is not contested. See *Harper v. Jones*, 195 F.2d 705 (10th Cir.1952); *CCCO-Western Region v. Fellows*, 359 F.Supp. 644 (N.D.Cal.1972).[5]

▪ Plaintiffs Anthony J. Bushlow and the other active service Navy personnel enjoy standing to challenge the constitutionality of the February 6 declaration. The standing of plaintiffs was challenged below only with regard to individuals who were nonactive duty military personnel or civilians. The district court did not rule on the issue. Plaintiffs Bushlow and Orr have challenged the off-limits order pursuant to Article 138 procedures (10 U.S.C. § 938), and have exhausted their intra-military remedies. Defendants concede that similar action by other active-service plaintiffs would be fruitless. At least with regard to active-service plaintiffs currently in the

---

**5.** Defendants do not argue that the doctrine of sovereign immunity bars plaintiffs' claims for nonmonetary relief. Generally, sovereign immunity has no application where a plaintiff claims that a government official has acted in violation of the Constitution or statutory authority. See *Larson v. Domestic And Foreign Commerce Corp.*, 337 U.S. 682, 689–691, 69 S.Ct. 1457, 1461–1462, 93 L.Ed. 1628; *Glines v. Wade*, 586 F.2d 675, 681 (9th Cir.1978), reversed on other grounds sub nom. *Brown v. Glines, supra*; 14 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3655, pp. 185–186 (1976). Alternatively, a number of courts have held that § 702 of the Administrative Procedure Act (5 U.S.C. § 702) constitutes a waiver of sovereign immunity in actions seeking nonmonetary relief under 28 U.S.C. § 1331. See *Glines*, 586 F.2d at 681; *Jaffee v. United States*, 592 F.2d 712, 719 (3d Cir.1979), certiorari denied, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845; *Hill v. United States*, 571 F.2d 1098, 1102 (9th Cir.1978). The Admiral's application of 32 C.F.R. § 631.11(b), reviewed by the Armed Services Disciplinary Review Board and other high-level Navy officials, would constitute the necessary "agency action" under this latter waiver theory.

Navy, the necessary injury in fact has been suffered, has been caused by the challenged conduct and can be remedied by judicial decree. See C. WRIGHT & A. MILLER & E. COOPER FEDERAL PRACTICE AND PROCEDURE § 3531 (2d ed. 1984).

It is also important to clarify that only review of the February 6 declaration is before this Court. Plaintiffs request review of the district court's denial of the September 24, 1982, motion for a temporary restraining order (Br. 6; oral argument). Plaintiffs below failed to pursue the issues raised in the TRO concerning actions by officers aboard Navy vessels allegedly taken in reliance upon the February 6 Flatley order. No motion for a preliminary injunction was ever filed following the TRO denial nor were the issues raised by the TRO presented to the district court at any later time. Assuming that plaintiffs have not waived any challenge to the onboard actions, civilian judicial scrutiny of the TRO denial and of the underlying constitutionality of the alleged conduct involved therein would nevertheless be inappropriate at this time in light of the great caution with which we are required to proceed in reviewing military decisions. See, e.g., Brown, 444 U.S. at 354, 100 S.Ct. at 599. There is no evidence in the record, nor have plaintiffs suggested, that military review of the U.S.S. America and U.S.S. Texas incidents has been sought by the Navy personnel involved in the incidents, Daniel Philip Lantis and Ronald Dan Caton, or by the plaintiffs pursuant to appropriate military channels, specifically, Article 138 of the Uniform Code of Military Justice, 10 U.S.C. § 938. Action taken by the military courts under Article 138 procedures could obviate the need for any interference by this Court in military matters. This Court will not consider these claims until the appropriate military authorities have first considered the issues.

The denial of relief to plaintiffs Orr and Bushlow pursuant to their Article 138 proceedings did not preclude or render fruitless the seeking of redress through military channels regarding the ship incidents. The record indicates that the requests for redress undertaken by plaintiffs Orr and Bushlow pursuant to Article 138 were limited to challenging the February 6 order (Exhibits B through D of Exhibit 11 to R. Item 22). Although the affidavits presented in support of the TRO indicate that the alleged action taken aboard the ships was based on or justified at least in part by the February 6 off-limits order, the propriety of the declaration and of the subsequent onboard incidents involves separate and distinct facts and concerns. The February 6 order is limited in scope to an off-limits order regarding three land sites and cannot be read to support or justify these later incidents.[6] The authorities designated to review Article 138 claims, the relevant officer exercising court martial jurisdiction, the Judge Advocate General and the Secretary of the Navy, are qualified to consider initially the type of constitutional issues raised by plaintiffs. Cf. Glines v. Wade, 586 F.2d at 678 (holding that the Air Force Board for the Correction of Military Records was an inappropriate body to consider plaintiff's constitutional claims and that exhaustion of remedies with that body was not necessary). Of course, any Article 138 complaint may be time-barred at this point. See 10 U.S.C. § 1106(c).

## IV

### A. THE RELEVANT STANDARD

■ Finally, we reach the issue of whether the February 6 declaration violated the First Amendment rights of at least the active-duty military personnel. It is well settled that "the members of the mili-

---

**6.** The alleged actions taken aboard the ships raise serious constitutional questions in light of the fact that all the evidence presented against the CFI in support of the February 6 order relates solely and directly to the activities of one man, L.R. Davis. The on-board actions apparently discriminatorily restrict the free exercise

of religion of presumptively moral and sincere persons having nothing to do with the illicit or improper activities referred to in the February 6 order. Thus our refusal to review the denial of the TRO should not be construed as a statement regarding the validity of the underlying issues it raises.

tary are not excluded from the protection granted by the First Amendment," *Parker,* 417 U.S. at 758, 94 S.Ct. at 2563; *Brown,* 444 U.S. at 354, 100 S.Ct. at 599, and some form of civilian judicial review of allegedly unconstitutional acts by military officials is a necessary corollary to this proposition. See *Bitterman,* 553 F.Supp. at 722. The *Chappell* decision is certainly not to the contrary. Justice Douglas noted that while Congress, via art. I, § 8, cl. 14 of the Constitution, "has power 'To make Rules for the Government and Regulation of the land and naval Forces' * * *, the only express exemption of a person in the Armed Services from the protection of the Bill of Rights is that contained in the Fifth Amendment which dispenses with the need for 'a presentment or indictment' of a grand jury 'in cases arising in the land or naval forces, or in the Militia, when in actual service in time of war or public danger.'" *Parker,* 417 U.S. at 766, 94 S.Ct. at 2566–67 (Douglas, J., dissenting). It is also clear that "the different character of the military mission requires a different application of those [First Amendment] protections." *Id.* at 758, 94 S.Ct. at 2563.

▮▮▮ The traditional standard of review utilized in considering First Amendment challenges in the civilian context of state regulation of the free exercise of religion is that such interference is subject to strict scrutiny and the imposition of a mere incidental burden on the free exercise of religion may only be upheld if narrowly drawn and justified by a compelling state interest. See *Thomas v. Review Board of Indiana Employment Security Division,* 450 U.S. 707, 718–719, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624; *Wisconsin v. Yoder,* 406 U.S. 205, 214–215, 92 S.Ct. 1526, 1532–1533, 32 L.Ed.2d 15; *Sherbert v. Verner,* 374 U.S. 398, 403, 406–407, 83 S.Ct. 1790, 1793, 1795,

10 L.Ed.2d 965. Even compelling state interests, however, are not totally free from a balancing process when their effectuation impinges on the fundamental right embodied in the free exercise clause. *Yoder,* 406 U.S. at 214, 92 S.Ct. at 1532.

In arriving at the appropriate level of scrutiny in this context, the Supreme Court has taught us that the "rights of military men must yield somewhat 'to meet the overriding demands of discipline and duty * * * '", *Brown,* 444 U.S. at 354, 100 S.Ct. at 599 (quoting *Burns v. Wilson,* 346 U.S. 137, 140, 73 S.Ct. 1045, 1048, 97 L.Ed. 1508). Articulation of the standard of review to be applied to First Amendment challenges to military action has proven to be no simple task. See, *e.g., Goldman,* 734 F.2d at 1535–1537; *Bitterman,* 553 F.Supp. at 722–725. While the Supreme Court has given some indications as to the relevant standard, particularly in *Brown,* the most reasoned articulation of this standard and one which is faithful to relevant Supreme Court authority was recently set forth in *Goldman, supra,* by Judge Swygert of this Court (sitting by designation with the United States Court of Appeals for the District of Columbia). *Goldman,* in its attempt to accommodate, in the words of *Brown,* the "overriding demands of discipline and duty," 444 U.S. at 354, 100 S.Ct. at 599, dropped the balancing inquiry mandated by *Yoder* and formulated a general standard:

> The inquiry does not require a "balancing" of the individual and military interests on each side, but rather, a determination whether legitimate military ends are sought to be achieved by means designed to accommodate the individual right to an appropriate degree.

734 F.2d at 1536.[7] *Goldman* cautioned, however, that application of such a standard assumes the existence and need to

7. The standard set forth in *Goldman* deals with the review of a specific type of military decision (involving constitutionally protected First Amendment rights) and is not contrary in any way to the broad four-part balancing test set forth in *Mindes v. Seaman,* 453 F.2d 197 (5th Cir.1971), for determining generally whether a civilian court should undertake review of a military decision. Application of the *Mindes* test to the concerns and specific circumstances implicated in *Goldman* clearly indicates that civilian judicial review was appropriate in that case. In view of the First Amendment rights raised by this appeal, review is also proper here under a *Mindes* analysis.

resolve a clash between individual rights and government powers. *Id.* Consequently, the court undertook a preliminary inquiry into whether the case involved legitimate military ends on the one hand and valid religious practices on the other, and ultimately found a clash between "constitutionally guaranteed individual rights and constitutionally authorized military power." 734 F.2d at 1538. It was determined that the on-duty covering of the head with a yarmulke was a valid and protected part of Goldman's exercise of his religion (although subordinate to the Air Force rule against it). The court also ruled that the military's interest in uniform dress requirements (more generally in order and obedience, *id.* at 1539) was a valid one, emphasizing the Air Force's authority, delegated by Congress, to promulgate dress code regulations. *Id.* at 1538. The court contrasted *Frontiero v. Richardson* as a case where no special deference was shown to statutes governing the military because the provisions were not a congressional judgment on a uniquely military matter.[8] *Id.* at 1537. The preliminary inquiry should focus on the constitutional source and abstract nature of the challenged regulation or decision rather than on the substance or specific content of any particular matter.

■ Assuming the existence of a genuine clash between individual rights and military concerns, the proper analysis must then consider two questions: 1) Has the military applied the proffered military end or interest (by a particular regulation or decision) to the specific situation or circumstances at issue in an irrational, invidious or arbitrary manner (see *Brown,* 444 U.S. at 357 n. 15, 100 S.Ct. at 601 n. 15)? 2) Does the challenged regulation or action restrict the protected First Amendment conduct "no more than is reasonably necessary to protect the substantial government interest" (*id.* at 355, 100 S.Ct. at 600)?

Any inquiry into the arbitrary or irrational nature of a military regulation or application thereof must be undertaken with great caution and deference in light of the specialized nature of judgments concerning internal military governance. *Goldman,* 734 F.2d at 1538. See *Brown,* 444 U.S. at 360, 100 S.Ct. at 602; *Cafeteria and Restaurant Workers Union v. McElroy,* 367 U.S. 886, 890–894, 81 S.Ct. 1743, 1746–1748, 6 L.Ed.2d 1230; *Bridges v. Davis,* 443 F.2d 970, 973 (9th Cir.1971), certiorari denied, 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789. *Goldman* considered the feasibility of the Air Force allowing certain exceptions to the uniform dress requirements, but deferred to the Air Force's expertise despite "serious questions concerning the restrictiveness of the Air Force regulations and the manner of their enforcement," and ruled that strict enforcement of the regulations was necessary and that the general allowance of a "religious garb" exception could seriously disrupt the interest in uniformity. 734 F.2d at 1539, 1541.

Similarly, in considering whether the challenged action is no more restrictive than is reasonably necessary to effectuate the military's substantial interest, the "least restrictive alternative" doctrine cannot be applied with full force. But see *Bitterman,* 553 F.Supp. at 725. Rather, *Goldman* phrased the inquiry as whether the means selected to achieve legitimate ends are "designed to accommodate the individual right to an appropriate degree." 734 F.2d at 1536. *Goldman* observed that the suggested less restrictive alternative of barring only religious dress practices which are "actually obtrusive" was not feasible because of the very nature of a uniformity requirement, where any exception would serve to undermine the very interest underlying the rule. *Id.* at 1540. In *Brown* the Supreme Court held that the Air Force

---

**8.** In *Frontiero,* the High Court considered the constitutionality of a statute governing receipt of medical and dental benefits by members of the armed services, without even mentioning the need to weigh special military concerns and apply a different level of scrutiny. Cf. *O'Callahan v. Parker,* 395 U.S. 258, 262, 89 S.Ct. 1683, 1685, 23 L.Ed.2d 291 (only service-connected crimes fall under military jurisdiction). Thus, not all review of constitutional claims that are somehow related to the military requires application of a different and more permissive standard.

regulations challenged therein "restrict[ed] speech no more than is reasonably necessary to protect the substantial governmental interest," but noted that the Air Force commanders had "no authority whatever to prohibit distribution of magazines and newspapers through regular outlets" or the mail. 444 U.S. at 355–356, 100 S.Ct. at 600.

## B. APPLICATION OF THE STANDARD

### 1. Preliminary Inquiry

■ We hold that this case involves a valid clash between constitutional rights of individuals and legitimate military interests. The February 6 declaration undoubtedly involves valid military ends or concerns. As in *Goldman*, the Admiral's action here was taken pursuant to a congressional delegation of power. The military interests of discipline, loyalty, morale and preparedness all were threatened by the alleged conduct of L.R. Davis of the Christian Fellowship. Mere encouragement of unauthorized absences among servicepersons, whether on active or nonactive duty, let alone the actual absences themselves, severely reduces the military's ability to carry out its express mission. Further, the guarding of servicemen and servicewomen from sexual assault or improper sexual intimidation clearly protects the physical, emotional and psychological well-being of those personnel and their ability to serve effectively in the military.

With regard to the other preliminary question, the record does not disclose whether defendants were burdening or interfering with genuine religious practices of the plaintiffs. The precise protected religious activity normally transpiring at the most controversial off-limits site, the Servicemen's Center, never was described by the plaintiffs in their complaint or elsewhere. The complaint merely stated that defendants "discriminated against the Plaintiffs on the basis of not allowing Plaintiffs to freely practice the religion of

their choosing, declaring the premises in which the Plaintiffs engaged in their said practice of religion off-limits * * *." Yet the defendants have never challenged that such protected religious activity did not in fact occur at the Servicemen's Center. Rather, defendants have virtually admitted, or at least assumed, the existence of such conduct or practices [9] and have instead chosen to claim that the effect of or burden created by the off-limits declaration on such practices was only incidental or minimal (Defendants' Br. 24–26). There is evidence in the record that a regular program of religious singing and "devotions" took place every Wednesday evening at 6:30 and Sunday afternoon at 12:30 at the Servicemen's Center. A number of clearly nonreligious activities, however, also transpired regularly at the Center. The Center offered to all servicepersons "a game room with ping pong and pool tables, a T.V. lounge, library and a kitchen and dining area with plenty of hot coffee and snacks." (Attachment 5 of Exhibit B to R. Item 22).

Organized worship is a genuine and protected religious practice, but all activity conducted or organized by a religious group does not receive the same degree of protection under the First Amendment. See *NLRB v. World Evangelism, Inc.*, 656 F.2d 1349, 1353 (9th Cir.1981) (church's interest in running a commercial enterprise outweighed by the National Labor Relations Act's role of promoting labor peace); *Valente v. Larson*, 637 F.2d 562, 570 (8th Cir.1981), affirmed, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (solicitation of religious groups not automatically exempt from regulation); *Espinosa v. Rusk*, 634 F.2d 477, 481, 483 (10th Cir.1980), affirmed, 456 U.S. 951, 102 S.Ct. 2025, 72 L.Ed.2d 477 (religious solicitation for "secular" purposes protected); Laycock, *Towards A General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Colum.L.Rev. 1373, 1390, 1409–1411 (1981). Since plain-

---

**9.** See p. 59 of Exhibit A to R. Item 45 ("Bible Study or scriptures discussion * * * went on up there"); p. 15 of Exhibit B to R. Item 45 ("their religious activities were expressly excluded as a basis for any kind of off limit action") (statements of Admiral Flatley).

tiffs have not demonstrated that any significant protected religious activities took place at the Karcher Hotel or the CFI main office, the declaration was entirely permissible as to those sites.[10] In light of the defendants' position regarding the Servicemen's Center, however, we must assume that there is a clash here between guaranteed First Amendment rights and valid military interests.

### 2. Arbitrariness of the Military Decision

Plaintiffs do not challenge the constitutionality of the statute and regulation authorizing the February 6 order, 10 U.S.C. § 5947 & 32 C.F.R. § 631.11(b), but rather only the specific application of the provisions in this instance.

Considering only the evidence before us, Admiral Flatley's order cannot in any way be characterized as irrational, arbitrary or invidious. The NIS investigation and supporting testimony raise substantial questions about L.R. Davis' active encouragement of unauthorized absences among churchmember-servicepersons and about improper and perhaps even criminal sexual activity with regard to certain military personnel. Assertions that Admiral Flatley could have done more to verify the allegations and his admitted reluctance that such verification was not made (p. 58 of Exhibit A to R. Item 45) do not negate the significance of that evidence. The fact that some of the evidence amounts to hearsay and surmise is not fatal, *Bridges*, 443 F.2d at 974 (Koelsh, J., concurring); the Admiral did not need evidence sufficient to convict Davis of wrongdoing in order to issue a declaration seeking to guard Navy personnel from a significant perceived danger.

Plaintiffs might have shown the February 6 order to be the result of an arbitrary, irrational or invidious decision, although in view of the government's substantial evidence of wrongdoing by L.R. Davis, they would need to demonstrate not only that the Navy allegations were false but also that Admiral Flatley knew or should have known that they were false. But in the eighteen months that passed between the filing of the complaint and Judge Leighton's order of November 7, 1983 (largely due to plaintiffs' three requests for time extensions), plaintiffs presented no evidence tending to refute the allegations against L.R. Davis or to refute the evidence submitted by the government in September of 1982. Plaintiffs' sole request for discovery came eight months after commencement of the action. Defendants' response to the discovery motion stated that all requested documents either did not exist, were already in the court's possession or were privileged as attorney-client communications (R. Item 34). Plaintiffs did not thereafter pursue the discovery process.

The appropriate standard of review and burden of proof in the context of a constitutional or statutory challenge to military action is far from settled. Further, this Court is hesitant to affirm dismissal of a case or summary judgment at a procedurally early point in litigation where a district court has ruled erroneously on preliminary points of law and not reached the factual issues. Yet the express statements in *Brown, Parker* and *Greer* (regarding the power of a civilian court to overturn arbitrary or irrational military decisions) should have indicated to plaintiffs that the scrutiny imposed in the context of military action allegedly impinging on First Amendment freedoms is less strict than in the civilian context and that there was a duty incumbent on plaintiffs to come forward with significant evidence of their own. This plaintiffs did not do. Nor have they asserted that they could present such new evidence below. Rather, plaintiffs merely seek to have the district judge review the government's evidence and decide if it is sufficient to support the Admiral's decision.

A determination as to the arbitrary or irrational nature of a military decision in

---

**10.** It also appears that the issue of relief with regard to the Karcher Hotel has become moot due to a fire destroying the site.

this context should ordinarily be reserved for the district judge. The substantial evidence presented by the defendants combined with plaintiffs' inability or unwillingness to refute that evidence, however, convinces us that no meaningful purpose would be served by remanding this case below for an express determination under the "arbitrary, invidious or irrational" standard.[11]

### 3. Appropriate Accommodation of Individual Rights

The final point of inquiry here is whether the off-limits order was "designed to accommodate the individual right to an appropriate degree." 734 F.2d at 1536. We are constrained in our attempt to assess the adequacy of the narrowness of Admiral Flatley's declaration since, as noted earlier, it is not readily apparent from the record or arguments before us precisely what type of religious activity occurred at the Servicemen's Center. Nor is it clear what alternate facilities were available to military personnel members of the CFI for religious worship, study and association. Defendants claim that CFI members have regularly conducted religious activities on premises other than those declared off-limits (Defendants' App. A–13). If the CFI operated a main house of worship in a nearby town or city, the declaration's interference with First Amendment rights could rightly be characterized as, in defendants' words, "mere inconvenience to plaintiffs which does not rise to the level of constitutional deprivation" (Br. 35). However, if the order has forced plaintiff military personnel to gather for worship in various private homes or scattered temporary sites, or has separated them from the gathering of a civilian religious community, the order must be closely tailored and necessary to implement the military's legitimate concerns.

The degree of interference or intrusiveness of military action upon constitutional-

ly protected activity, and the degree of protection to which the affected religious activity is entitled determine what is an "appropriate" accommodation of First Amendment rights. See Laycock, *supra* at 1409–1412. An order displacing religious worship must be more closely related to or more important in effectuating a particular military interest than an order impinging on a less fundamental or a less "intensely religious" practice or observance. See *id.* at 1409 (First Amendment "interest in conducting [here attending] a worship service is clearly greater than [an] interest in organizing a trip to a baseball game for the church men's club"). Further, an order which completely bars participation in religious services merits closer scrutiny than an order merely restricting the time or location of participation. *Id.* at 1412.

The Supreme Court noted in *Buckley v. Valeo* that "[i]ntolerable persecutions throughout history led to the Framers' firm determination that religious worship—both in method and belief—must be strictly protected from government intervention." 424 U.S. 1, 93 n. 127, 96 S.Ct. 612, 670 n. 127, 46 L.Ed.2d 659. Even in the context of the religious rights of prisoners, it is well established that prison officials may not completely ban the attendance of inmates at religious services unless the prohibition promotes a compelling or important state objective and is "reasonably necessary" or "reasonably adapted" to achieve that objective. *LaReau v. McDougall*, 473 F.2d 974, 979 (2d Cir.1972), certiorari denied, 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123; *Lipp v. Procunier*, 395 F.Supp. 871, 877 (N.D.Cal.1975) (three-judge district court). Plaintiff servicepersons certainly deserve no less protection.

Here the possibility that the government requried individuals to move their established and chosen place of organized community worship or required individuals to

---

11. This appeal solely concerns the constitutionality of the February 6 declaration as of its date of issuance. A decision in favor of defendants does not preclude the possibility that a change

in circumstances regarding the CFI, *e.g.,* a change in its leadership, could render the continued enforcement of the off-limits order arbitrary or irrational at some later point in time.

worship separately from the church's congregation would be, if true, a highly intrusive and severe interference with the exercise of religious freedom and could weaken or destroy a particular religious community. Such interference would entitle plaintiffs, who had nothing to do with the improper activities alleged in the February 6 order, to a high degree of constitutional protection. The lesser degree of First Amendment protection generally enjoyed by noncivilians is tempered here by the fact that plaintiffs seemingly only seek the right to exercise their religious freedom at off-duty times and on nonmilitary sites.[12]

On the other hand, the defendants' interest in isolating military personnel from L.R. Davis is lessened where the contact takes place in the context of an organized religious worship service. In view of Davis' preeminent position in the CFI, such services would almost certainly involve contact with him. The evidence of Davis' wrongdoing presented by the government, however, involved individual encounters with Davis, and there is no indication that he advocated unauthorized absences or illicit sexual activity from the pulpit or at other

church services.[13] The nature of religious services would seem to preclude the type of individualized contact with Davis with which the military is legitimately concerned.

In summary, assuming that religious worship itself has been displaced by the declaration and that no readily available alternative site existed in which plaintiffs could worship, it becomes incumbent on the defendants to show why an exception to the off-limits order should not exist for established times of community worship. Defendants could, for example, set forth circumstances indicating to the district judge that such an exception is administratively infeasible or that attendance at the CFI's organized worship services would necessarily entail the type of individual encounters or specific harms that the military legitimately desires to avoid. The appropriate action is for the district court to determine the precise religious practices that took place at the Servicemen's Center and the degree of intrusiveness the off-limits declaration imposed upon those practices,[14] and, if necessary, to consider the

12. Prior cases considering challenges to military regulation of religious activity have involved on-duty activity occurring on military grounds. See *Goldman, supra; Bridges, supra; Bitterman, supra; Geller v. Secretary of Defense,* 423 F.Supp. 16 (D.D.C.1976). The government's power to require the conducting of religious services in suitably zoned areas, *Grosz v. City of Miami Beach,* 721 F.2d 729, 739 (11th Cir.1983), involves different concerns than those implicated in this case and does not justify the prohibiting of participation by certain members of a religious community in organized worship at a previously established worship site. The mere regulation of the use of land and buildings by religious bodies requires a compelling public interest and must be reasonable. *Jehovah's Witnesses Assembly Halls, Inc. v. Jersey City,* 597 F.Supp. 972 (D.N.J.1984). See *First Assembly of God v. City of Alexandria, Va.,* 739 F.2d 942 (4th Cir.1984), certiorari denied, — U.S. —, 104 S.Ct. 434, 83 L.Ed.2d 360; *Lakewood Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood,* 699 F.2d 303 (6th Cir.1983).

13. The right of the military to prohibit military personnel from attending religious services which involve public urgings of service personnel to take unauthorized absences and thereby violate their duties must be distinguished from a situation involving the protected right of mili-

tary personnel to attend the services of a religious group that advocates a general theology of pacifism and nonviolence.

14. As noted earlier, the degree of intrusiveness upon religious practices cannot be determined from the record. The duty to set forth this degree of intrusiveness and to articulate sufficiently the scope and nature of their religious practices falls on the plaintiffs. See *Goldman,* 734 F.2d at 1536–1537. They have not yet been forthcoming regarding their obligations. In view of the importance of the issues presented in this case, however, and the ease with which plaintiffs can establish the type of religious activity that was conducted at the Servicemen's Center at the time of the declaration (as compared to the near impossibility of their sufficiently refuting the defendants' evidence of L.R. Davis' wrongdoing), it is appropriate to remand this case to the district court. More importantly, we also have noted previously that defendants never have contested that organized religious worship took place at the Center on a regular basis, but instead have indicated that such worship has in fact been displaced. *Supra* p. 1181. In view of defendants' admission, it is premature to close the door completely on plaintiffs' claims because they have not yet specifically proven matters that the defendants have admitted as true.

military's explanation as to why it is not feasible to modify the off-limits order to accommodate certain protected religious practices. Until the district court conducts this inquiry, the February 6 order will not have received the scrutiny required by the First Amendment. The district court's order is affirmed insofar as it denies damages to the plaintiffs. As to declaratory and injunctive relief, which were not discussed in the order below (Defendants' App. A–1—A–5), the cause is remanded with respect to the individual defendants so that the appropriateness of such relief can be determined in further proceedings consistent herewith, each side to bear its costs herein.[15] Circuit Rule 18 shall apply.

---

15. As the successor to the office of Commander of the GLNTC, Commodore Thomas R.M. Em-   ery, U.S.N., is automatically substituted as a party to this action. See Fed.R.App.P. 43(c).