**Murray BITTERMAN, Plaintiff,**

v.

**SECRETARY OF DEFENSE, et al., Defendants.**

Civ. A. No. 82–1455.

United States District Court, District of Columbia.

Dec. 14, 1982.

720

Nathan Lewin, David Butler, and Robert Smith, Washington, D.C., for plaintiff.

R. Craig Lawrence, Asst. U.S. Atty., Washington, D.C., for defendant; Francis S. Moran, Jr., Lt. Colonel, USAF, General Litigation Div., Washington, D.C., of counsel.

## MEMORANDUM

GASCH, District Judge.

■ This case presents the question of whether the United States Air Force can constitutionally enforce its dress regulation, AFR 35–10, which has been interpreted as prohibiting plaintiff from wearing a yarmulke while in uniform on active duty.

Plaintiff, Sergeant Murray Bitterman, is a member of the United States Air Force

and is presently stationed at Vandenburg Air Force Base as an air traffic controller.

Plaintiff originally joined the Air Force on January 31, 1977 under the Delayed Enlistment Program. On May 5, 1977 plaintiff was entered on active duty and subsequently completed basic training. Plaintiff's first duty station was Holloman Air Force Base, New Mexico. On June 6, 1980, plaintiff voluntarily reenlisted in the Air Force for a period of five years and received a reenlistment bonus of $9,863.70.[1] At that point in time, plaintiff, in spite of his knowledge that conflicts existed between his religious beliefs and Air Force requirements, acknowledged that "[m]any laws, regulations, and military customs will govern my conduct and require me to do many things a civilian does not have to do." On October 4, 1980, plaintiff was reassigned to the 392d Communications Group, Vandenburg Air Force Base, California, as an air traffic controller. On May 24, 1982, plaintiff, after learning of the Court's decision in *Goldman v. Secretary of Defense,* No. 81–1522 (D.D.C. April 26, 1982), approached his superior officer requesting permission to wear his yarmulke while in uniform. This request was denied. Plaintiff filed his complaint herein on May 27, 1982, at which time he moved for a temporary restraining order. After a hearing the Court denied plaintiff's motion and set a hearing on plaintiff's motion for preliminary and permanent injunctions and a trial on the merits for June 17, 1982. On June 17, 1982, the Court denied defendants' motion to dismiss and, in addition, took plaintiff's motion for injunctive relief under advisement.

Pursuant to joint stipulations, the parties agreed that plaintiff is a member of the Orthodox Jewish Faith, that plaintiff wears a yarmulke pursuant to the well-established traditions of such religion, but that plaintiff has not worn his yarmulke while in uniform because of the prohibition of AFR 35–10 even though the wearing of his yarmulke would not interfere with his duties as an air traffic controller. In addition, the parties

1. Prior to reenlistment plaintiff became a member of the Orthodox Jewish Faith.

stipulated that Dr. Howard Rossman, former physician with the Air Force, would testify that he wore a yarmulke while on active duty between the years 1974 and 1976 pursuant to the permission of the Air Force.

During the trial of this action, Dr. Samuel Levinson, a clinical psychologist and retired Air Force colonel, testified that in his opinion the wearing of yarmulkes by uniformed personnel on active duty would have a minimal effect on the Air Force. However, Dr. Levinson also testified that his opinion was based neither upon any studies that he had conducted or read, nor upon any material gathered pursuant to scientific method.

In presenting their defense to this action, defendants called Lieutenant General Andrew P. Iosue, Deputy Chief of Staff of the Air Force for Manpower and Personnel. In this capacity, General Iosue has responsibility for general supervision of all personnel, military or civilian, assigned to the Air Force. In addition, General Iosue has general responsibility for adherence to the requirements of AFR 35–10.[2] In his past military service, General Iosue has held four major commands, two of which were during the Viet Nam conflict. General Iosue has served in the Air Force personnel area for a period of approximately ten years. On the basis of the General's entire duty experience, the Court concludes that with regard to matters involving military personnel, General Iosue is qualified to express an expert opinion.

He testified that AFR 35–10 is a comprehensive regulation outlining the requirements and standards of dress and neatness required of all members of the Air Force. Additionally, the General testified that the mission of the Air Force is to be an instrument of national defense with responsibility for attaining the objectives delineated by the Commander-in-Chief. In establishing and maintaining a combat-ready fighting force, the General testified, there are five major considerations involved in such a task: teamwork, motivation, discipline, esprit de corps, and image. The General further testified that all five of these factors are furthered by AFR 35–10 as follows:

1. The uniform dress requirement leads to teamwork as *all* individuals are required to wear a standard uniform;

2. The uniform dress requirement promotes and enhances motivation in that individuals from diverse backgrounds are assimilated into a unit and issued a standard uniform thereby encouraging a unified force;

3. The uniform dress requirement promotes discipline as compliance with the regulation manifests a disregard for personal preferences and evinces self-discipline and an obedience to the team concept;

4. The uniform dress requirement promotes esprit de corps thereby providing the pride and self confidence necessary to an effective fighting force; and

5. The uniform dress requirement promotes the image of the Air Force by setting it aside as a military, regimented cohesive unit working together to achieve its mission.

Significantly, Dr. Levinson, on cross-examination, testified that the five factors listed above promote the overall objectives of the Air Force. Consistent with this testimony, General Iosue testified that on two prior occasions, deviations or perceived deviations, from the uniform dress requirement tended to undermine the achievement of these five factors. On an occasion, a squadron in Southeast Asia, failing to adhere to the uniform dress requirement, was a less effective organization than other units and, importantly, began to improve when strict adherence to the dress standards was enforced; the General testified that there is a direct correlation between mission performance and adherence to the dress requirement.

2. AFR 35–10 provides (in pertinent part):

Air Force members will wear the appropriate Air Force uniform while performing their military duties. . . . Members will wear only the uniform items prescribed by this regulation. . . . The wearing of combinations of uniform items not specifically prescribed in this regulation is prohibited.

In the second incident, the belief that a base commander had allowed one deviation from the regulation led to problems when other personnel on the base were denied a similar departure from regulations. In fact, the Air Force is concerned that in allowing one deviation it would then be difficult to differentiate and deny other requests for deviations from the regulation. In enforcing AFR 35–10, the Air Force treats all religions uniformly, except with regard to attendance at religious ceremonies or services. It is clear to the Court that if the Air Force allowed members of the Jewish Faith to wear yarmulkes while in uniform on usual active duty assignments, the service would find itself in the unmanageable position of processing numerous requests for exemptions by followers of other religions to wear non-uniform garments that those individuals believed were required by the tenets of their particular religion. Members of the Air Force belong to a wide variety of religions, many of which have specific dress requirements.[3]

■ With regard to the propriety of judicial review of the military regulation involved in the instant case, the Supreme Court has cautioned that it is only in rare circumstances that a court should attempt to displace the judgment of military leaders:

> [J]udges are not given the task of running the Army. . . . The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.

*Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 539–40, 97 L.Ed. 842, *reh. den.,* 345 U.S. 931, 73 S.Ct. 779, 97 L.Ed. 1360 (1953). This principle of non-interference by the courts in military decisions has recently been reaffirmed by the Supreme Court. *See, e.g., Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973);

*Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975); *McLucas v. De Champlain,* 421 U.S. 21, 95 S.Ct. 1365, 43 L.Ed.2d 699 (1975). In *Gilligan, supra,* the Supreme Court emphasized:

> [I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability.

*Id.* 413 U.S. at 10, 93 S.Ct. at 2445 (emphasis in original). This line of authority indicates that it is only in those cases wherein a clearly established constitutional right is alleged to have been violated that the judicial branch of our government should exercise its power of review.

■ Defendants assert that, pursuant to this "non-interference" rule, the Court should conclude that the regulation in question is beyond judicial review. However, because plaintiff has alleged violation of his First Amendment right of freedom of religion, and since members of the military are not excluded from the protections of the First Amendment, *Parker v. Levy, supra,* the Court concludes that a review of AFR 35–10 as applied to plaintiff is proper.

Having concluded that under the circumstances of the instant case the regulation in question is subject to judicial review, the Court now focuses upon the proper standard to be applied in such a review.

Defendants argue in this regard that the Court's review of the regulation in question should be governed by the so-called "rational basis" test as articulated in *Kelley v. Johnson,* 425 U.S. 238, 247, 96 S.Ct. 1440,

---

**3.** *See* Attachment 1 to Defendant's Motion to Dismiss or in the Alternative for Summary Judgment and Opposition to Issuance of Preliminary Injunction (June 14, 1982).

1445, 47 L.Ed.2d 708, *on remand, Dwen v. Barry,* 543 F.2d 465 (2d Cir.1976), and *Marshall v. District of Columbia,* 392 F.Supp. 1012 (D.D.C.1975), *remanded on other grounds,* 559 F.2d 726 (D.C.Cir.1977). Pursuant to this standard, plaintiff would shoulder the burden of showing that there is no rational connection between AFR 35–10 and the promotion of teamwork, motivation, discipline, esprit de corps and image. This showing plaintiff has clearly failed to make. However, both *Kelley* and *Marshall* dealt with regulations concerning police uniforms, and, in the realm of police dress, important considerations of the interaction between the police and the general public arise. *See Marshall, supra,* 392 F.Supp. at 1016. The "rational basis" standard *has* been applied in cases involving military dress regulations. *See Campbell v. Beaughler,* 519 F.2d 1307 (9th Cir.1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 82 (1976).

■ In *Sherwood v. Brown,* a later Ninth Circuit case, 619 F.2d 47 (9th Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 147 (1980), a more stringent test was imposed. In this brief per curiam opinion, the Ninth Circuit affirmed the district court which upheld the court martial order discharging a Sikh who insisted on wearing his turban as part of his religious obligations. He had sought a declaration that the uniform regulation was unconstitutional as to him. The rule imposed was that the governmental regulations which infringe protected religious practice are proscribed by the free exercise clause unless the government can demonstrate that the regulation is the least restrictive alternative to meet a compelling state need. The court derived this rule from *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), a case in which the state had imposed a $5 fine on Amish parents who refused to send their children to public school beyond the eighth grade for religious reasons in violation of the state school attendance law. Nevertheless, what the Supreme Court said in *Parker v. Levy, supra,* concerning the applicability of First Amendment principles in the military is clearly applicable to the situation with which the Court is confronted in this case.

However, for the reasons dictating a different application of First Amendment principles in the military context described above, we think that the " 'weighty countervailing policies,' " *Broadrick, supra,* [413 U.S.] at 611 [93 S.Ct. at 2915], which permit the extension of standing in First Amendment cases involving civilian society, must be accorded a good deal less weight in the military context.

*Id.* 417 U.S. at 760, 94 S.Ct. at 2563 *citing Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 2914, 37 L.Ed.2d 830 (1973). Similarly, in the instant case, the "weighty countervailing policies" which demand nearly absolute protection of free exercise of religious beliefs in civilian society, must be accorded a great deal less weight in the military context. Therefore, under the facts of this case, the Court concludes that whether the *Yoder* test as adopted in *Sherwood* is applied, (i.e., whether the government interest is of sufficient magnitude to override the interest claiming protection under the First Amendment) or whether the rational basis test is applied, the result would be the same.

■ In balancing the interests involved, it is important to remember that:

[T]he different character of the military community and of the military mission requires a different application of [First Amendment] protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it.

*Parker v. Levy, supra* 417 U.S. at 758, 94 S.Ct. at 2562; *see also Brown v. Glines,* 444 U.S. 348, 354, 100 S.Ct. 594, 599, 62 L.Ed.2d 540, *on remand, Glines v. Wade,* 618 F.2d 623 (9th Cir.1980). In the instant case, then, the Court holds that in order to withstand judicial review, the regulation in question, although presumptively valid, must protect a substantial governmental interest overshadowing the First Amendment

right that is being circumscribed. *Brown v. Glines, supra,* 444 U.S. at 354, 100 S.Ct. at 599; *see Sherwood v. Brown, supra,* 619 F.2d at 48.[4] Further, the regulation must regulate no more conduct than is reasonably necessary to protect the substantial governmental interest asserted, *Brown v. Glines, supra,* 444 U.S. at 355, 100 S.Ct. at 599; yet this strict standard of review is to be tempered by the substantial deference to be accorded military judgments as to the appropriate ways in which to further a compelling interest for:

> The military is, "by necessity, a specialized society separate from civilian society." Military personnel must be ready to perform their duty whenever the occasion arises. To ensure that they always are capable of performing their mission promptly and reliably, the military services "must insist upon a respect for duty and a discipline without counterpart in civilian life." ... Thus, while members of the military services are entitled to the protections of the First Amendment, "the different character of the military community and of the military mission requires a different application of those protections." The rights of military men must yield somewhat " 'to meet certain overriding demands of discipline and duty . . . .' "

*Id.* at 354, 100 S.Ct. at 599 (citations omitted).

■ There is no doubt that the effective functioning and maintenance of the Air Force is a substantial compelling governmental interest. Likewise, there is no doubt that motivation, image, morale, discipline and esprit de corps, are essential to the efficient functioning and operation of the Air Force. These factors also constitute a substantial compelling government interest.

The Court, in reaching this conclusion, takes judicial notice of the historical fact that following the resounding defeat of our green, inexperienced, and inadequately trained force at the Kasserine Pass in North Africa in 1942, General Eisenhower relieved General Fredendall and put General Patton[5] in command of the II Corps. At page 150 of *Crusade in Europe,* (New York, Doubleday & Co., Inc., 1948) General Eisenhower wrote:

> General Patton's buoyant leadership and strict insistence upon discipline rapidly rejuvenated the II Corps and brought it up to fighting pitch. Moreover, the troops were now fortified by battle experience and had a much higher appreciation of the value of training, discipline, and speed in action.

Justice Powell, speaking for the majority in *Brown v. Glines, supra,* 444 U.S. at 357 n. 14, 100 S.Ct. at 601 n. 14, reflects approval:

> Loyalty, morale, and discipline are essential attributes of all military service. Combat service obviously requires them. And members of the Armed Services, wherever they are assigned, may be transferred to combat duty or called to deal with civil disorder or natural disaster. Since the prior approval requirement supports commanders' authority to maintain basic discipline required at nearly every military installation, it does not offend the First Amendment.

■ In short, the Court agrees with the considered judgment of professional military officials, prompted by generations of experience in war and peace, that allowing

---

4. Nevertheless, the Court also concludes that the military dress regulation involved in the instant case is at least entitled to the same presumption of validity accorded the police regulations in *Kelley, supra,* 425 U.S. at 247, 96 S.Ct. at 1445. *See Jones v. Secretary of Defense,* 346 F.Supp. 97 (D.Minn.1972).

5. The late Harry H. Semmes, a distinguished member of the bar of this Court for forty years, in his *Portrait of Patton* (New York, Appleton-

Century Press, 1955), at page 8, quotes the General:

> It is human to resent being told what to wear and how to wear it. Insistence on strict compliance with uniform regulations breaks down the barrier of resentment to discipline, possibly more than anything else. If men strictly obey the regulations about wearing the uniform, they can be held truly disciplined men. Discipline is the backbone of all military operations.

departures from the uniformity standards of AFR 35–10 would adversely affect the promotion of teamwork, counteract pride and motivation, and undermine discipline and morale, all to the detriment of the substantial compelling governmental interest of maintaining an efficient Air Force.

In addition, the Court, based upon the rationale expressed by the Supreme Court in *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), *on remand,* 311 N.W.2d 843 (Minn.1981), concludes that AFR 35–10, as interpreted to prohibit plaintiff from wearing his yarmulke while in uniform on active duty, is the least intrusive means to achieve the substantial governmental interest enunciated above. In *Heffron,* the Supreme Court held that a rule or regulation cannot be viewed in the context of the adherents of only one particular religion, rather such rule must be evaluated in the context of treating all religions equally. Moreover, in a case involving facts similar to those in the instant case, the court, in upholding the Navy counterpart of AFR 35–10, logically recognized that "because *all* naval personnel are subject to military duties which implicate the [compelling governmental interest], no less restrictive alternative exists." *Sherwood v. Brown, supra,* 619 F.2d at 48 (emphasis in original).

It is with these principles in mind that the Court reviews AFR 35–10; that is, in deciding whether AFR 35–10 is the least restrictive means of furthering the governmental interest discussed above. Its effect upon the religious practices of all Air Force personnel must be considered, not just its effect upon the wearing of a yarmulke by an Air Force Sergeant who is a member of the Orthodox Jewish Faith. When viewed from this perspective, it becomes clear that there is no less restrictive means to promote and maintain uniformity among Air Force personnel, thereby furthering teamwork, motivation, discipline, esprit de corps and image than by across-the-board enforcement of AFR 35–10. For example, it would clearly be unconstitutional for the Air Force to require that all adhere to the same religious beliefs, that all adhere to none, or even that no member of the Armed Services be allowed to practice his or her religious beliefs. Theoretically this would promote uniformity. Consistent with this reasoning, the Court concludes that whatever limitation has been imposed upon plaintiff by requiring that he adhere to the requirements of AFR 35–10, it does not amount to a judicially cognizable infringement of his First Amendment rights. This conclusion finds support in Appel, *The Concise Code of Jewish Law,* Vol. I at 34 n. 3 (1977), which provides:

> One is nevertheless permitted, especially where one's livelihood is involved to accept employment in a position where he will be required to go bareheaded, inasmuch as covering the head is prescribed by custom but not demanded by law.

It is interesting to note that in a recent Seventh Circuit case, *Menora v. Illinois High School Ass'n,* 683 F.2d 1030 (7th Cir. 1982), Jewish basketball players challenged the High School Association's rule forbidding basketball players from wearing yarmulkes or other head covering while playing. The Court, speaking through Judge Posner, said:

> ... while we are not Talmudic scholars we are reasonably confident, and the plaintiffs' counsel acknowledge at oral argument, that the precise nature of the head covering and the method by which it is kept on the head are not specified by Jewish law. *The wearing of a yarmulke —which by its size and position is liable to fall off in any activity involving sudden movement—is conventional rather than prescribed; some orthodox Jews prefer to wear an ordinary hat instead.* The affixing of the yarmulke to the head (more precisely, the hair) by bobby pins is even more obviously a convention rather than a religious obligation, and it happens to be an inherently insecure method of keeping the yarmulke attached during basketball play.

*Id.* at 1033–34 (emphasis added).

With these considerations in mind, it is evident that plaintiff's desire to wear his

yarmulke while in uniform on active duty really constitutes a personal religious preference. Given a compelling governmental interest in cases involving the military on the one hand, and the need to consider the rights of personnel on the other hand, it is necessary to determine which interest predominates. Based on the facts of this case and giving due weight to the opinions of those who have testified, the Court concludes that to accommodate that governmental interest, it becomes necessary that plaintiff's rights under the Free Exercise clause be circumscribed to some degree in the furtherance of the governmental interest. In considering the possible restrictions upon plaintiff's Free Exercise rights to determine which is least restrictive, the Court believes that, if a restriction must be imposed in order to accommodate a compelling governmental interest, it is preferable that the practice of a religious preference be circumscribed rather than the practice of a religious requirement. Plaintiff may cover his head with his yarmulke while attending Jewish religious services.

In the instant case AFR 35–10 only incidentally affects Sergeant Bitterman's practice of a religious *preference,* as distinguished from his adherence to the religious *requirements* of Orthodox Judaism. As such, enforcement of AFR 35–10 constitutes the least restrictive means to accommodate the compelling governmental interest previously described. In reviewing the established facts, the Court is unable to formulate a less restrictive way to promote the five factors considered essential to the proper maintenance of the Air Force. At this point, the Court believes substantial deference is due the judgment of military leaders as to what conduct on the part of personnel need be restricted, and to what degree, so long as that decision is reasonable and within constitutional bounds. *Burns v. Wilson,* 346 U.S. 137, 140, 73 S.Ct. 1045, 1047, 97 L.Ed. 1508, *reh. den.,* 346 U.S. 844, 74 S.Ct. 3, 98 L.Ed. 363 (1953).

In accordance with these considerations, the Court concludes that AFR 35–10 is the least intrusive means of achieving an important governmental interest for there is no less restrictive means of promoting and maintaining teamwork, motivation, discipline, esprit de corps and image than, as was done in the instant case, through strict and evenhanded enforcement of AFR 35–10. The fact that AFR 35–10 is entitled to a presumption of validity, and the fact that the judgment of professional military officials is to be accorded substantial deference, mandates that AFR 35–10 be declared constitutional as applied to plaintiff.[6] This memorandum constitutes the Court's findings of fact and conclusions of law. Rule 52, Federal Rules of Civil Procedure.

---

**6.** The Court is disinclined to follow *Goldman v. Secretary of Defense, supra,* which held that an Air Force captain, a rabbi on duty in an Air Force hospital, was entitled to wear his yarmulke while in uniform on active duty. The Court in that case relied upon *Rostker v. Goldberg,* 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981). But in *Rostker,* Justice Rehnquist, speaking for the majority, reversed the three-judge district court, holding that the court was quite wrong in undertaking an independent evaluation of the evidence rather than adopting an appropriately deferential examination of Congress' evaluation of that evidence. Congress had excluded women from the Military Selective Service Act and this the district court had declared unconstitutional. The principal authorities relied on in *Rostker* are the same authorities on which this Court relies in its decision.