**Andrew FRANCIS and Raymond Brown, Plaintiffs,**

v.

**John P. KEANE, Superintendent of the Sing Sing Correctional Facility, Joseph Demskie, Acting Superintendent of the Sing Sing Correctional Facility, Thomas Coughlin, Commissioner of the New York State Department of Correctional Services, Deputy Superintendent Greiner, Sing Sing Correctional Facility, Lieutenant A. Enceneat, Sing Sing Cor-**

rectional Facility, Captain M. Watford, New York State Department of Correctional Services, Thomas Testo, Director of Labor Relations, New York State Department of Correctional Services, Defendants.

No. 93 Civ. 0045 (JGK).

United States District Court,
S.D. New York.

June 7, 1995.

James I. Meyerson, New York City, for plaintiffs.

August L. Fietkau, Asst. Atty. Gen., State of N.Y., Dept. of Law, New York City, for defendants.

## OPINION AND ORDER

KOELTL, District Judge:

This case presents a conflict between two correctional officers' rights to the free exer-

cise of religion and a grooming regulation that has been applied to them. The plaintiffs, two African–American correctional officers at Sing Sing Correctional Facility ("Sing Sing" or "facility"), are members and followers of the Rastafarian Church. The plaintiffs were ordered by their employer, the New York State Department of Correctional Services ("DOCS"), to cut their hair pursuant to Directive 3083 ("directive"), which regulates the dress and grooming of correctional officers.[1] The plaintiffs' hair had been styled in short braids or twists, a form of modified dreadlocks. Under the threat of suspension for insubordination and under protest, the plaintiffs cut their hair. (Exh. E to Meyerson Aff. Opp'n Mot.) The plaintiffs contend that they were forced to compromise their religious beliefs to keep their jobs.

The plaintiffs have challenged the directive, on its face and as applied, claiming that their statutory and constitutional rights to the free exercise of religion have been violated. The defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## I.

Plaintiffs Andrew Francis ("Francis") and Ramon Brown ("Brown"), who are African–American, have been employed by DOCS as correctional officers for over five years.

Since some time in 1991, the plaintiffs have been attending the Rastifarian Church at 116th Street and Eighth Avenue in New York City and following its beliefs, practices and tenets. At approximately the same time, the plaintiffs began to wear their hair in short braids, a form of modified dreadlocks, as expressions of their religious beliefs.

Until October or November of 1992, the plaintiffs wore their hair in the modified dreadlocks without incident. No one at Sing Sing commented to the plaintiffs about their hair or reprimanded them in any way relating to their hair. Until that time, correctional officers at Sing Sing were permitted to wear hats both inside and outside of the facility. However, both plaintiffs contend that even with the policy of allowing hats, their colleagues and superiors at Sing Sing knew of their modified dreadlocks since the time they began to wear them.

In October or November of 1992, the policy with respect to hats was changed; correctional officers no longer were permitted to wear their hats inside the facility with very limited exceptions. Sometime around that date, the plaintiffs were informed that they no longer could wear their modified dreadlocks and on December 18, 1992, they were issued directives requiring them to re-style their hair by December 21, 1992. Believing that complying with the directives would lead them to violate their religious beliefs and fearing suspension for insubordination if they failed to cut their hair, the plaintiffs initially chose not to return to work after December 21, 1992, but later decided to cut their hair and return to work pending the resolution of their case.

1. The relevant section of Directive 3083 (Uniform/Equipment Issue & Appearance) provides:

VII. **PERSONAL GROOMING STANDARDS**—Employees shall be well groomed, appropriately dressed and present a neat, clean appearance while on duty....
A. *Hair*—The hair must be kept clean and within Department standards. Uniformed staff may not wear hair styles that feature spikes, shaved patterns, lines, tails, symbols or names cut into the hair. Unnatural color dyes, or any other styles which distract from their professional appearance should be avoided.
1. Males—The hair shall be neatly groomed so as not to fall over the ears or eyebrows or extend more than ½″ below the top of the uniform collar.

2. Females—While in uniform, the hair shall be neatly groomed and arranged/styled so that it does not extend more than ½″ below the top of the uniform collar.
Pins, combs, or barrettes similar to the color of the hair are permitted, provided they are tasteful, not ostentatious, and concealed as much as possible.
Hair ornaments or ribbons shall not be worn.
(Exh. A to Defs.' 3(g) Statement). At oral argument, counsel for the defendants conceded that the plaintiffs' hairstyle is not specifically addressed by the directive. While DOCS may consider the plaintiffs' modified dreadlocks akin to spikes, the defendants primarily argue that the plaintiffs' hair distracts from their professional appearance. (*See* Rivera Aff. Supp.Defs.' Mot.Summ.J. at ¶ 5.).

Claiming that their rights to the free exercise of religion have been violated, the plaintiffs have sued the defendants under 42 U.S.C. § 1983, the Religious Freedom Restoration Act of 1993 ("RFRA")[2], 42 U.S.C. § 2000bb *et seq.*, and Article I, Section 3 of the New York State Constitution seeking declaratory and injunctive relief.[3] They are not seeking monetary damages.[4] The defendants have moved for summary judgment on the plaintiffs' statutory and constitutional claims.

## II.

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue resolution." *Gallo,* 22 F.3d at 1224.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. The substantive law governing the case will identify those facts which are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether summary judgment is appropriate, a court must resolve all ambiguities, and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)); *see also Gallo,* 22 F.3d at 1223.

If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See Chambers v. TRM Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

In support of their motion, the defendants argue that the directive does not violate the plaintiffs' right to the free exercise of religion. They contend that the directive does not, on its face, implicate the plaintiffs' free exercise rights, and that, with respect to any incidental burden on the plaintiffs' rights, deference should be accorded to the judgment of DOCS that the directive is essential to safety, discipline and esprit de corps. Looking to other contexts in which courts frequently have addressed challenges to grooming and dress requirements, the defendants argue that they are entitled to summary judgment because no issues of material fact remain with respect to the magnitude of the interests that purportedly underlie the directive, as well as with respect to the appropriateness of the directive to advance such interests.

2. The defendants have withdrawn their challenge to the constitutionality of RFRA. (Letter from August L. Fietkau to Judge Leisure of 11/1/94.)

3. In their complaint, the plaintiffs also claimed that the directive was enforced in a racially discriminatory manner; however, they are not pur-

suing this claim. (Letter from James I. Meyerson to August Fietkau of 2/17/95).

4. Accordingly, the defendants have withdrawn the affirmative defense of qualified immunity as a basis for their motion.

## III.

■ RFRA provides a statutory claim or defense to persons whose religious exercise is substantially burdened by the government. *See* 42 U.S.C. § 2000bb(b).[5] RFRA purports to restore the compelling state interest test to facially neutral laws of general applicability that substantially burden the free exercise of religion which had been modified by the Supreme Court's decision in *Employment Div., Dep't of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

Prior to 1990, the Supreme Court subjected laws that burdened the free exercise of religion to the strictest level of scrutiny under which such laws had to be narrowly tailored to serve compelling state interests. *See, e.g., Wisconsin v. Yoder,* 406 U.S. 205, 215, 234, 92 S.Ct. 1526, 1533, 1542, 32 L.Ed.2d 15 (1972) (The Free Exercise Clause of the First Amendment barred the application of compulsory school attendance law to Old Order Amish who did not send their children to school after the eighth grade because "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."); *Sherbert v. Verner,* 374 U.S. 398, 403, 410, 83 S.Ct. 1790, 1793, 1797,

---

5. Since the passage of RFRA, courts have differed in their treatment of free exercise challenges with respect to the relationship between RFRA and the First Amendment. Some courts apply the compelling governmental interest test articulated in RFRA to claims brought under the First Amendment. In other words, rather than treating RFRA as providing a separate and distinct statutory cause of action with a different standard than that applicable to constitutional claims, they apply the test contained in RFRA to claims brought under the Constitution as well as to claims brought under the statute. *See, e.g., Best v. Kelly,* 879 F.Supp. 305, 308 (W.D.N.Y. 1995) (applying the RFRA standard to a claim brought under the First Amendment); *Allah v. Menei,* 844 F.Supp. 1056, 1061 (E.D.Pa.1994) (applying the RFRA standard in denying the defendant's motion for summary judgment where the plaintiff had asserted claims under both the First Amendment and RFRA); *Boone v. Commissioner of Prisons,* No. Civ. A. 93–5047, 1994 WL 383590, *7 (E.D.Pa. July 21, 1994) (applying the RFRA standard to the plaintiff's First Amendment free exercise claim).

At oral argument, both parties agreed that the statutory and constitutional claims should be addressed separately under different standards. And, there is authority for such treatment. First, the statute specifically provides plaintiffs with an independent claim separate and apart from a constitutional claim. It provides, in relevant part:

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

42 U.S.C. § 2000bb–1(c) (1994). And, as Justice Thomas explained in his dissent from the Supreme Court's denial of certiorari in *Swanner v. Anchorage Equal Rights Comm.,* —— U.S. ——, 115 S.Ct. 460, 130 L.Ed.2d 368 (1994):

RFRA was Congress' response to our decision in *Employment Div., Dept. of Human Resources of Ore. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which supplanted the compelling interest test in Free Exercise Clause jurisprudence with the inquiry into whether a governmental burden on religiously motivated action is both 'neutral' and 'generally applicable.' Thus, *as a substitute for constitutional protection,* RFRA grants a statutory 'claim or defense to persons whose religious exercise is substantially burdened by government.'

*Id.* at ——, 115 S.Ct. at 460 n. 1 (citing 42 U.S.C. § 2000bb(b)(2)) (emphasis added). Finally, other courts have analyzed the constitutional and statutory claims separately. *See, e.g., Campbell–El v. District of Columbia,* 874 F.Supp. 403, 408–09 (D.D.C.1994) (analyzing prison inmate's claim under two different standards); *Campos v. Coughlin,* 854 F.Supp. 194, 204–13 (S.D.N.Y. 1994) (Sotomayor, J.) (considering the plaintiffs' free exercise claims under both the RFRA compelling interest test and the lesser First Amendment reasonableness standard applicable to claims by prison inmates in granting a preliminary injunction); *Bessard v. California Community Colleges,* 867 F.Supp. 1454, 1456 (E.D.Cal. 1994) (granting the plaintiffs' motion for summary judgment on their RFRA claim and noting that "[b]ecause this case can be decided on statutory grounds, plaintiffs' First Amendment claims need not be reached").

For purposes of deciding this motion, the Court has analyzed the plaintiffs' RFRA and constitutional claims separately and reviewed the state's justifications under the RFRA compelling interest standard and lower First Amendment reasonableness standard that applies to free exercise claims by prison inmates. Even doing so, the defendants' motion for summary judgment must be denied on all claims because there are substantial factual issues concerning both whether the defendants' actions were necessary to advance a compelling interest and whether the defendants' actions were even reasonably related to legitimate penological interests.

10 L.Ed.2d 965 (1963) (applying the compelling state interest test and holding that the disqualification of a Sabbatarian from receiving unemployment benefits because of her refusal to work on Saturdays violated the Free Exercise Clause); *see also Thomas v. Review Board, Indiana Employment Sec. Division,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981) ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest.").

In *Smith,* the Supreme Court rejected this compelling state interest test for facially neutral laws of general applicability that only incidentally burden the free exercise of religion. 494 U.S. at 883–85, 110 S.Ct. at 1602–03. In *Smith,* the Supreme Court held that the Free Exercise Clause of the First Amendment did not forbid the state of Oregon from either banning sacramental peyote use by Native Americans through its general criminal prohibition of ingestion of the drug or denying unemployment benefits to persons terminated from their jobs for such religiously inspired peyote use. *Id.* at 890, 110 S.Ct. at 1606; *see also Church of Lukumi Babalu Aye, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472 (1993) ("[O]ur cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.") (citation omitted).

Congress responded to *Smith* by passing RFRA. *See* 42 U.S.C. § 2000bb. RFRA's purpose is to "restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to

guarantee its application in all cases where free exercise is substantially burdened...." 42 U.S.C. § 2000bb(b)(1).

■ RFRA makes clear both the strict standard under which free exercise cases should be evaluated and the government's burden of proof. It provides, in pertinent part:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1. The statute specifies that "demonstrates" means meets the burdens both of production and of persuasion. 42 U.S.C. § 2000bb–2(3).[6]

The defendants argue that under the RFRA standard, they are entitled to summary judgment. They argue that the legislative history of RFRA indicates that the Court should accept the compelling nature of DOCS's interests in safety, discipline and esprit de corps.

The defendants' arguments under RFRA should be understood against the background of the pre-RFRA Supreme Court cases that have analyzed the free exercise claims of

---

**6.** A plaintiff asserting a claim under RFRA must make a threshold showing that his or her religious exercise has been substantially burdened before requiring the government to meet its burdens of production and persuasion with respect to proving a compelling governmental interest and the use of the least restrictive means. *See, e.g., Davidson v. Davis,* No. 92 Civ. 4040, 1995 WL 60732, *5 (S.D.N.Y. Feb. 14, 1995); *Bessard v. California Community Colleges,* 867 F.Supp. 1454, 1463 (E.D.Cal.1994); *Boone v. Commissioner of Prisons,* No. Civ. A. 93–5074, 1994 WL 383590, *7 (E.D.Pa. July 21, 1994). For purposes of their motion for summary judgment, the defendants have not claimed that the plaintiffs have failed to meet this initial burden. (Defs.' Reply Mem. Further Support Mot.Summ.J. at 5.) Similarly, the defendants have not contested the sincerity of the plaintiffs' religious beliefs. *See Patrick v. LeFevre,* 745 F.2d 153, 157, 159–60 (2d Cir.1984) (noting the subjective definition of religion that courts use and holding that the district court should not have granted the defendant's motion for summary judgment because the issue of the plaintiff's sincerity presented questions of fact).

prison inmates. Even prior to *Smith*, the Supreme Court treated free exercise claims by prison inmates differently from other free exercise claims because while "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison[,]" *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979), "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Rather than apply a compelling state interest test to prison regulations that burdened inmates' rights to the free exercise of religion, the Supreme Court applied the "reasonableness" test of *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and *O'Lone v. Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) ("*Turner/O'Lone* standard" or "*Turner/O'Lone* reasonableness test"). In *O'Lone*, the Supreme Court explained that in scrutinizing a prison regulation that burdens a prison inmate's free exercise right, the regulation need only be "reasonably related to legitimate penological interests." *Id.* at 349, 107 S.Ct. at 2404 (citing *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261).[7]

Both the House and the Senate Reports explain that RFRA's compelling state interest test applies to free exercise claims by prison inmates. *See* S.Rep. No. 111, 103d

Cong., 1st Sess. (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892 ("Senate Report"); H.R.Rep. No. 88, 103d Cong., 1st Sess. (1993) ("House Report"), 1993 WL 158058. The legislative history indicates that RFRA was intended to restore the "traditional" compelling state interest test in the prison context that was "weakened" by *O'Lone*. Senate Report at 9, 1993 U.S.C.C.A.N. at 1898–99. However, the Senate Report also explains that while RFRA establishes one test for all claims of government infringement on religious practices, "[t]his single test ... should be interpreted with regard to the relevant circumstances in each case." Senate Report at 9, 1993 U.S.C.C.A.N. at 1898. Accordingly, "the committee expects that the courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Senate Report at 10, 1993 U.S.C.C.A.N. at 1900. However, "the state must do more than simply offer conclusory statements that a limitation on religious freedom is required for security, health of [sic] safety" to establish that its interests are of the "highest order." Senate Report at 10, 1993 U.S.C.C.A.N. at 1899 (internal quotations and citation omitted).

While the present case is set in the context of a correctional facility, it involves the free exercise claims of correctional officers rather

---

7. In *O'Lone*, the Court explained that this lower level of scrutiny gives due deference to prison administrators. *Id.* at 349, 353, 107 S.Ct. at 2404, 2407. Applying this test, the Court upheld the refusal to allow certain inmates to attend religious services on Friday afternoons held in certain buildings of the prison, concluding that such refusal was reasonable in light of the penological concerns for institutional order, security and rehabilitation. *Id.* at 353, 107 S.Ct. at 2407.

In *O'Lone*, the Court adopted the analysis previously set forth in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), for evaluating prison regulations. In *Turner*, the Supreme Court upheld a regulation limiting inmate-to-inmate correspondence and struck a regulation restricting inmate marriages. *Id.* at 81, 107 S.Ct. at 2257. The Court in *Turner* held that regulations that impinge on prison inmates' constitutional rights are valid if they are "reasonably related to legitimate penological interests." *Id.*

at 89, 107 S.Ct. at 2262. The Court explained that the relevant factors in determining the reasonableness of a regulation are: first, whether there is a valid and rational connection between the prison regulation and the legitimate governmental interest asserted; second, whether there are alternative means of exercising the right to religious freedom left open to inmates; third, the impact that accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally; and fourth, the absence of ready alternatives. *Id.* at 89–91, 107 S.Ct. at 2262; *see also Benjamin v. Coughlin*, 905 F.2d 571, 576–77 (2d Cir.) (applying the *Turner/O'Lone* standard in holding that tying the plaintiff inmate's hair back represented a suitable alternative to a prison directive requiring an initial haircut upon admission to a correctional institution for purposes of an identification photograph), *cert. denied*, 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990).

than inmates. Although the need for good order, security and discipline unquestionably exists in this context, the application of the standards developed in the context of free exercise claims by prison inmates must be done carefully to ensure that the defendants' asserted justifications make sense as they relate to correctional officers as opposed to inmates.

Even affording deference to the experience and expertise of prison administrators, the defendants' motion for summary judgment must be denied. The defendants clearly have failed to demonstrate that the directive is the least restrictive means of advancing the state's asserted interests in safety, discipline and esprit de corps; in fact, the defendants have failed to provide any specific evidence that the directive, as it has been applied to the plaintiffs, advances such interests at all, leaving issues of material fact and precluding summary judgment.

At oral argument, counsel for the defendants conceded that there have been no specific incidents to support the requirement, pursuant to the directive, that the plaintiffs cut their hair. The sum total of the defendants' evidence supporting the directive and its application to the plaintiffs is contained in an affidavit by Israel Rivera, Assistant Commissioner of DOCS. The affidavit states, in relevant part:

> In order to maintain safety, discipline, and an *esprit de corp* [sic] among uniformed corrections officers, who are law enforcement officers, Regulation 3083 was promulgated.... By requiring uniformed personnel to maintain standard requirements for dress and grooming, corrections officers maintain a degree of discipline essential in a prison. Standard uniforms and appearance permit easy recognition by fellows [sic] officers and inmates, especially in emergencies. Restrictions on hair length and style promote discipline and directly relate to the safety of corrections officers in the event of any violent contact with an inmate. Long hair and various hair styles are more susceptible to being grabbed by an inmate.... [The plaintiffs'] hairstyle distracts from a correction

officer's professional appearance and is akin to "spikes" in the hair.

(Rivera Aff.Supp.Defs.' Mot.Summ. J. at ¶¶ 2–5.)

These are the kind of unsupported and conclusory statements that courts consistently reject as insufficient to overcome a free exercise challenge. *See, e.g., Hamilton v. Schriro,* 863 F.Supp. 1019, 1024 (W.D.Mo. 1994) (recommending injunctive relief where the prison required the plaintiff, a Native American inmate, to cut his hair and forbade him from using a religious sweat lodge because the prison failed to produce evidence that it used the least restrictive means as required by RFRA); *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) (Sotomayor, J.) ("[D]efendants cannot merely brandish the words 'security' and 'safety' and expect that their actions will automatically be deemed constitutionally permissible conduct."); *Rust v. Clarke,* 851 F.Supp. 377, 380 (D.Neb.1994) (fact issue with respect to whether the defendants used the least restrictive means precluded summary judgement on inmate's free exercise claim under RFRA).

Here, it is not at all apparent how the plaintiffs' modified dreadlocks implicated the concerns that the defendants claim the directive is meant to address—namely, safety, discipline and esprit de corps. The defendants describe the plaintiffs' modified dreadlocks as "short braids approximately ¾ to 1¼ inches long protruding straight out from the scalp." (Exh. C to Defs.' 3(g) Statement.) The plaintiffs contest this characterization, describing their former hairstyle as "flat, unobtrusive, and minimal in all respects." (Pls.' Mem.Opp'n Mot. at 17.) The modified dreadlocks, as demonstrated in the photographs submitted to the Court in connection with the defendants' motion, did not hang down more than one half inch below the plaintiffs' collars and they appear to have been consistent with the plaintiffs' characterization of them.

The defendants have not provided the Court with any evidence to support their argument that the directive, as it has been applied to the plaintiffs, even advances their interest in safety. They have not offered

evidence of even a single incident during the period of time the plaintiffs wore their modified dreadlocks—approximately one year—to support their argument that the plaintiffs' hairstyle posed any security risk because their hair could be grabbed by an inmate. Moreover, as the plaintiffs argue, if the plaintiffs wore their hair in other "permitted" hairstyles, such as in natural afros or in "gerri curls," their hair would not violate the directive, but it would be easier to grab and, therefore, would frustrate the purported objectives of the directive. (Pls.' Mem. Opp'n Mot. at 7–8.)[8] Similarly, the fact that the directive permits women to wear long hair so long as it is arranged or styled so that it does not extend more than one half inch below the top of the uniform collar and men to wear ties, which are much more easily grabbed, undercuts the defendants' argument that the modified dreadlocks are not permitted because they can be grabbed.

Similarly, the defendants have failed to provide any evidence that the directive fosters discipline or esprit de corps. And, provisions of the directive itself undercut the defendants' argument about the importance of absolute uniformity to advance these interests. For example, female correctional officers may wear skirts or culottes instead of pants and they may wear pins, combs or barrettes in their hair "provided they are tasteful, not ostentatious, and concealed as much as possible." Similarly, correctional officers who are wearing short-sleeved shirts without jackets have the option of wearing neckties. Additionally, correctional officers

appointed prior to 1990 are permitted to wear beards that are less than one inch long and all correctional officers may wear mustaches. All of this demonstrates that DOCS tolerates some variation from absolute uniformity despite its purported interests in discipline and esprit de corps. Moreover, the justifications proffered by DOCS are the types of conclusory and unsupported allegations that the Senate Report on RFRA indicated should not be deemed sufficient, even in the context of prison regulations, to overcome a free exercise claim.

For all of the foregoing reasons, the defendants are not entitled to summary judgment on the plaintiffs' RFRA claim.

## IV.

■ The plaintiffs also claim that their rights under the First Amendment of the United States Constitution were violated.[9] This claim is brought under 42 U.S.C. § 1983.[10] Because there are almost no cases addressing free exercise claims by correctional officers, the defendants urge the Court to consider cases involving free exercise claims by law enforcement officers, prison inmates and military personnel. The defendants argue that under these cases, they are entitled to summary judgment.

The defendants rely primarily on cases in which grooming regulations were upheld as applied to law enforcement personnel. These cases accord great deference to the judgment of law enforcement administrators in assessing free exercise challenges in this

---

**8.** The defendants have offered to permit the plaintiffs to wear wigs over their hair as an alternative way to comply with the directive. (Letter from August L. Fietkau to Judge Koeltl of 1/17/95.) The plaintiffs have rejected this offer because, as plaintiffs' counsel explained at oral argument, the plaintiffs' believe that wearing their hair in the desired style, without hiding it, is part of their religious beliefs and that, therefore, they should not be compelled to accept such an alternative unless the defendants advance a legitimate reason why they should do so. (*See also* Letter from James I. Meyerson to August Fietkau of 2/17/95.) In any case, this offer tends to belie DOCS's claim that the plaintiffs' modified dreadlocks implicated a concern that their hair could be grabbed. Surely, a wig could be grabbed just as easily.

**9.** The Free Exercise Clause of the First Amendment provides that "Congress shall make no law ... prohibiting the free exercise [of religion]." U.S. Const., amend. I.

**10.** 42 U.S.C. § 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulations, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

context. *See, e.g., Marshall v. District of Columbia*, 392 F.Supp. 1012, 1014–15 (D.D.C. 1975), (the government's interest in "the projection of an image which facilitates the effective functioning of the police department necessary to ensure the safety and security of our citizens" held sufficient, under the *Yoder* test, to withstand a challenge by a police officer to a hair and beard regulation), *aff'd in part and remanded in part*, 559 F.2d 726 (D.C.Cir.1977); *see also Kelley v. Johnson*, 425 U.S. 238, 247, 96 S.Ct. 1440, 1446, 47 L.Ed.2d 708 (1976) ("Choice of organization, dress, and equipment for law enforcement personnel is a decision entitled to the same sort of presumption of legislative validity as are state choices designed to promote other aims within the cognizance of the State's police power.") (citations omitted).

The defendants also rely on cases addressing free exercise claims by prison inmates, arguing that the Court should apply the *Turner/O'Lone* reasonableness test. *See, e.g., Benjamin v. Coughlin*, 905 F.2d 571, 576–77 (2d Cir.1990) (applying the *Turner/O'Lone* reasonableness test to a free exercise claim by a prison inmate), *cert. denied*, 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990).

Finally, the defendants rely on cases involving free exercise claims by military personnel, arguing that "[c]orrections officers are similar to military personnel in that both groups need to be uniform." (Defs.' Further Reply Mem.Supp. Mot. Summ. J. at 58.) *See, e.g., Goldman v. Weinberger*, 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986) ("[W]hen evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.") (citations omitted).

Even under the cases on which the defendants rely, they have not demonstrated that they are entitled to summary judgment because their conclusory allegations do not establish that the application of the directive advances their asserted interests in safety, discipline and esprit de corps in any way. Even in *Marshall v. District of Columbia*, 392 F.Supp. 1012 (D.D.C.1975), *aff'd in part*

*and remanded in part*, 559 F.2d 726 (D.C.Cir.1977), on which the defendants heavily rely, the hair grooming regulation that applied to police officers was promulgated in response to citizen complaints about the appearance of police officers and the general consensus among police officers that relaxed grooming standards had resulted in the deterioration of the appearance of officers, undermining their effectiveness. *Id.* at 1014.

In *Benjamin v. Coughlin*, 905 F.2d 571, 576–77 (2d Cir.), *cert. denied*, 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990), the Court of Appeals refused to accept the conclusory incantation of penological interests as sufficient to justify requiring a Rastifarian inmate to submit to an initial haircut. *Id.* at 576–77. The court found that because the inmate's hair could be pulled back for an initial identification photograph, accommodating the inmate's religious views with only a de minimus effect on legitimate penological interests, the First Amendment, and the *Turner/O'Lone* reasonableness test, dictated such a result. *Id.*

In this case, grave questions remain with respect to the nexus, if any, between applying the directive to the plaintiffs and the defendants' asserted penological interests, making summary judgment inappropriate. *See, e.g., Werner v. McCotter*, 49 F.3d 1476, 1480 (10th Cir.1995) (reversing summary judgment for the defendant on inmate's free exercise claim where the record was devoid of evidence with respect to the magnitude of the governmental interest and the burden accommodation would impose); *Campbell v. District of Columbia*, 874 F.Supp. 403, 408–09 (D.D.C.1994) (denying defendant's motion to dismiss, or, in the alternative, for summary judgment where the court needed a more fully developed factual record to rule on the inmate plaintiff's statutory and constitutional free exercise claims); *Ross v. Coughlin III*, 669 F.Supp. 1235, 1239 (S.D.N.Y. 1987) (denying the prison's motion to dismiss an inmate's claim that a beard-trim requirement violated his First Amendment rights because, among other things, the prison failed to show that the regulation was logically related to legitimate governmental interests under the *Turner/O'Lone* standard); *cf. Cole v. Flick*, 758 F.2d 124, 130–31 (3d Cir.) (regulation requiring inmates to wear their

hair above the collar did not infringe on half-blooded Cherokee Indian inmate's free exercise rights where evidence, consisting of extensive expert testimony, supported justifications for the hair directive), *cert. denied,* 474 U.S. 921, 106 S.Ct. 253, 88 L.Ed.2d 260 (1985); *Sherwood v. Brown,* 619 F.2d 47, 48 (9th Cir.1980), *cert. denied,* 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 147 (1980) (affirming summary judgment for the Secretary of Defense on the plaintiff's claim that a navy regulation forbidding him from wearing a turban was unconstitutional and relying upon an affidavit of a senior naval officer explaining the specific dangers resulting from the absence of a helmet); *Bitterman v. Secretary of Defense,* 553 F.Supp. 719, 721 (D.D.C.1982) (holding that forbidding an air force sergeant from wearing his yarmulke did not violate the sergeant's First Amendment rights where the expert testimony presented explained how the uniform dress requirement furthered the air force's goals of fostering teamwork, motivation, discipline, esprit de corps and image as well as how, on two prior occasions, deviations or perceived deviations from the uniform dress requirement had tended to undermine the achievement of these objectives).

The defendants have chosen to rely on conclusory statements. They have not demonstrated, with any specificity, how it is that requiring the plaintiffs to cut their hair advances their asserted interests in safety, discipline and esprit de corps. Without such evidence, even under cases according substantial deference to administrators, the de-fendants' motion for summary judgment on the plaintiffs' First Amendment claim must be denied.

## V.

■ With respect to the plaintiffs' free exercise claim under the New York State Constitution [11], the appropriate test to be applied is not clear. *Rourke v. New York State Dep't of Correctional Servs.,* 159 Misc.2d 324, 603 N.Y.S.2d 647 (Sup.Ct. Albany Co. 1993), *aff'd,* 201 A.D.2d 179, 615 N.Y.S.2d 470 (3d Dep't 1994), apparently is the only free exercise case brought under the New York State Constitution by a correctional officer. In *Rourke,* the court held that the enforcement of the same directive that is at issue in the present case violated the right to the free exercise of religion of a Native American correctional officer under Article I, Section 3 of the New York State Constitution. *Id.* at 329, 603 N.Y.S.2d 647, 651.[12]

The trial court applied a compelling state interest test. The court acknowledged that the Supreme Court's decision in *Smith* lessened the scrutiny appropriate for laws of general applicability under the First Amendment of the United States Constitution and explained that the New York State Constitution continues to offer heightened protection. In applying strict scrutiny to the directive, the court explained:

> Although mindful of the U.S. Supreme Court's decision in [*Smith* ], and its departure from precedent, and the traditional compelling interest test of free exercise

11. Article I, Section 3 of the New York State Constitution provides:
    The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind; and no person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state. New York Const., Art. I, § 3.

12. The defendants contend that despite its striking factual similarity, *Rourke* is not controlling in the present case. (Letter from August L. Fietkau to Judge Koeltl of 1/17/95.) In *Rourke,* the plaintiff, who had been terminated because of his failure to comply with Directive 3083, brought an Article 78 proceeding and an action for a declaratory judgment seeking reinstatement, back pay, a declaration that the enforcement of the directive was unlawful as enforced with respect to him and an injunction to prevent enforcement of the directive in the future. The defendants chose not to appeal the *Rourke* case to the New York Court of Appeals.

The defendants have represented to the Court that the Third Department's decision in *Rourke* has not led DOCS to alter its policy with respect to the enforcement of the directive; rather, DOCS views *Rourke* as "limited to the particular facts and record before that court." (Letter from August L. Fietkau to Judge Koeltl of 1/17/95.)

The defendants' position is astonishing. They apparently have chosen to ignore the plain holding of the Third Department as well as their obligation to comply with the New York State Constitution.

jurisprudence, this Court cannot ignore the New York Court of Appeals' long history and commitment to the protection of individual rights and liberties beyond those afforded by the U.S. Constitution, and federal constitutional law. Given this history and commitment ... and the importance of this free exercise right, it is hard to imagine that New York would not continue to apply a 'strict scrutiny' standard of review, and a balancing of the state's competing interests and the fundamental rights of the individual.

*Id.* at 327, 603 N.Y.S.2d at 649–50.

On appeal, the Appellate Division affirmed, stating that "we agree with the Supreme Court that respondents have failed to demonstrate any legitimate State interest that outweighs petitioner's right to practice his religion." *Rourke v. New York State Dep't of Correctional Servs.*, 201 A.D.2d 179, 182, 615 N.Y.S.2d 470, 472 (3d Dep't 1994). The Third Department then proceeded to discuss the case not in terms of a compelling state interest analysis, but in terms of the balanc-

ing test articulated in *Bunny v. Coughlin*, 187 A.D.2d 119, 121, 593 N.Y.S.2d 354 (3d Dep't), *appeal dismissed*, 82 N.Y.2d 679, 619 N.E.2d 645, 601 N.Y.S.2d 567 (1993).[13] The court explained:

Constraining petitioner to choose between following the precepts of his religion, as he interprets them, and working as a State correction officer substantially encumbers his right to freely practice his religion, thus placing the burden upon respondents to demonstrate that requiring petitioner to comply with the policy furthers a legitimate State interest which outweighs the negative impact upon his religious freedom.

*Id.* at 183, 615 N.Y.S.2d at 472 (citations omitted).[14]

In any case, applying either a compelling state interest test to the plaintiffs' claim, as the lower court did in *Rourke*, or a balancing test, as the Appellate Division did in *Rourke*, the defendants' motion must be denied. If a compelling state interest test applies, the defendants' motion must be denied for the

---

13. In *Bunny v. Coughlin*, 187 A.D.2d 119, 593 N.Y.S.2d 354 (3d Dep't), *appeal dismissed*, 82 N.Y.2d 679, 619 N.E.2d 645, 601 N.Y.S.2d 567 (1993), the court held that a Rastifarian prison inmate did not have a right, under the New York Constitution, to wear a religious crown or to be provided with kosher meals. The court explained:

[T]he criteria for determining the validity of prison regulations impinging on the State constitutional rights of inmates are couched in somewhat different terms than the standard of review under the parallel provisions of the Federal Constitution. The Federal standard upholds such a regulation 'if it is reasonably related to legitimate penological interests.' The State standard 'requires a balancing of the competing interests at stake: the importance of the right asserted and the extent of the infringement are weighed against the institutional needs and objectives being promoted.'

*Id.* at 120, 593 N.Y.S.2d at 356 (citations omitted); *see also Rivera v. Smith*, 63 N.Y.2d 501, 511, 472 N.E.2d 1015, 1020, 483 N.Y.S.2d 187, 192 (1984) (restrictions on a prison inmate's right to the free exercise of religion "must be weighed against the institutional needs and objectives being promoted.") (citations omitted). The court in *Bunny* explained that any difference between the federal and state tests applicable to free exercise claims by prison inmates "appears to be more verbal than substantive." *Bunny*, 187 A.D.2d at 122, 593 N.Y.S.2d at 356.

14. In *Rourke*, the Appellate Division complained of many of the same deficiencies in the evidence that preclude summary judgment for the defendants in the present case. The court was not sufficiently convinced that long hair implicates security concerns because it can be grabbed by inmates, that uniformity enhances the esprit de corps and discipline of correctional officers, that disuniformity encourages inmates to challenge authority because it is perceived as weakness and that a uniform and disciplined staff provides a good model for inmates. *Rourke*, 201 A.D.2d at 183, 615 N.Y.S.2d at 472–73. The court relied on the fact that the directive does not provide plenary protection for any of the asserted interests; rather than requiring absolute uniformity, the directive permits female officers to have long hair *so long as it is* appropriately styled while on duty, it allows correctional officers hired before a certain date to wear beards, it permits moustaches and it provides female correctional officers with the option of wearing skirts or culottes instead of slacks. *Id.*, 615 N.Y.S.2d at 473.

The court observed that the correctional officer had worn his hair long for fourteen months without incident, before being told to cut his hair:

[I]n all this time respondents are unable to point to a single incident illustrative of any problem with security or, for that matter, of any problem with morale or the correction officers' 'esprit de corps' upon which they rely so heavily.

*Id.* at 183–84, 615 N.Y.S.2d at 473.

reasons that it must be denied with respect to the plaintiffs' RFRA claim, discussed above. If the balancing test applicable to inmate claims applies, the motion still must be denied because, as discussed above, and as the Appellate Division concluded in *Rourke*, the defendants have failed to adduce any evidence with respect to any nexus between the directive, as it has been applied to the plaintiffs, and DOCS's interests in safety, discipline and esprit de corps.

### VI.

In sum, the defendants have failed to establish that they are entitled to summary judgment under any of the applicable standards. The defendants have failed to establish that their asserted interests in safety, discipline and esprit de corps are sufficient to justify the application of the regulation at issue in this case to the plaintiffs' particular hairstyle in view of the plaintiffs' free exercise claims and the defendants have failed to establish that there are no genuine issues of fact with respect to the way in which the directive, as it has been applied to the plaintiffs, advances such interests.

Therefore, the defendants' motion for summary judgment is denied.

**SO ORDERED.**